JAMES R. LANGDON AND OTHERS *v.* THE VERMONT & CANADA RAILROAD COMPANY AND OTHERS.

[ IN CHANCERY. ]

*Receivers. Receivers and Managers. Mortgage Bonds. Priority. Waiver. Receivers' Debts. Strict Receivers. Multifariousness.*

The Vermont & Canada Railroad Co. in 1849-50, leased its railroad to the Vermont Central Rrailroad Co., at an annual rental of eight per centum, on the cost of its construction, with a provision that, in case the rent should remain four months in arrear and unpaid, the lessor should have the right to enter upon both roads, and run the same, until all rent due and growing due, while it was so in possession, should be paid by the net income. The Vermont Central Co. subsequently executed two mortgages of its roads and property, subject to said contracts of lease, to trustees, to secure first and second mortgage bonds; and surrendered possession of both roads to the trustees of the first mortgage. While they were in possession of, and running the roads, default was made in the payment of rent to the Vermont & Canada Co. The Vermont & Canada Co. then brought its bill in equity, praying for a decree for the rent then due,

and to be put in possession of both roads according to the terms of the contracts of lease, or, else "that the court would appoint some suitable person or persons, to be the receiver or receivers, and manager or managers of said roads and property." The contracts of lease were held valid and binding by this court; the property was placed in the hands of receivers to carry out the provisions of the same; and the cause was ordered to be continued on the docket of the Court of Chancery, open to all parties thereto for further orders. Subsequently, by decrees of the said court, upon notice to, and the assent of, all parties, the first and second mortgage bondholders of the Vermont Central Railroad Co. were authorized to elect annually, at meetings duly called for that purpose, a committee, consisting of two first, and one second mortgage bondholder, who should advise with the receivers and managers, concerning their management of the property, and audit their accounts. The bondholders elected and kept in office such a committee. The receivers and managers continued to act *as such* in the management of the property, and under and by the authority of various decrees of the Court of Chancery, entered by consent of the parties—the Vermont & Canada Co., and the bondholders' committee, having full notice thereof, and assenting, or failing to object thereto—issued various loans to a large amount for the purchase of equipment, and other additions to, or improvements upon, the property; securing the same upon certain equipment and the car service thereof; and negotiated said loans as *receivers* and *managers;* of all which the Vermont & Canada Co., and the bondholders' committee had notice.

The question being as to the equitable priority of right to payment from the income, or *corpus,* of the property, as between the holders of the loans, so issued by the receivers and managers, on the one hand, and the Vermont and Canada Railroad Co. and the first and second mortgage bondholders, on the other; and it being claimed that, the specific purpose for which the receivers were appointed having been accomplished before the issuance of said loans, although the receivers had never been discharged, they were not, at the time of the issue and negotiation of said loans, strict receivers, so that said loans do not constitute receivers' debts, or affect the rights of the Vermont & Canada Railroad Co., and the first and second mortgage bondholders, to the priority of payment and security. *Held,*

1. When receivers have executed the duty for which they were appointed, it is the right and duty of the party upon whose application they were appointed, to see to it that they are discharged, if he would avoid the consequences of their continuing to act in that capacity.

2. When persons act as receivers and managers, and issue negotiable obligations, as such, with the knowledge and assent of all the parties interested in the subject matter of the receivership, as against *bona fide* holders of such obligations, such parties are estopped to deny that they are just what they purport to be, namely, the obligations of receivers and managers, and as such, entitled to priority of payment from the assets of the trust.

3. It is immaterial whether they were strict receivers or not. Purchasers of the bonds, or securities, issued by them, relied upon their apparent authority, as such; and when one of two innocent parties must suffer, he shall suffer, who by his own acts occasioned the confidence and the loss; he, who gave the power or opportunity to do the act, must bear the burden of the consequences.

4. The first and second mortgage bondholders of the Vermont & Canada Railroad Co. having elected to avail themselves of an authority given for their benefit, and at public meetings chosen a committee to represent them in matters appertaining to the management of the property, are all bound by the acts of said com-

mittee, within the scope of its authority. The issuing of loans by the receivers and managers, as such, for the benefit and conservation of the property, was a matter within the scope of its authority to advise with the receivers and managers about, and assent to.

5. The Vermont & Canada Railroad Co. and the first and second mortgage bondholders of the Vermont Central Railroad Co., through their committee, having full knowledge of the acts of the receivers and managers, in issuing negotiable obligations, as such, and acquiescing therein and receiving some portion of the avails thereof, are estopped from denying that said acts are as binding upon them as the acts of strict receivers would have been; hence, as between the bona fide holders of the bonds so issued by the receivers and managers, and the Vermont and Canada Railroad Co., with its claim for rent, and the first and second mortgage bondholders of the Vermont Central Railroad Co., with their claim for interest, the former have the superior equity and must be first paid.

6. Taking a special security is not of itself a waiver of all other security. This generally depends on the understanding of the parties when the security is given.

7. A bill will not be dismissed for multifariousness, where the questions presented for adjudication by it, or some of them, are questions, in which all the orators have a common interest, and where none of the defendants are embarrassed in making their defense, by the alleged misjoinder of parties or causes of action. Story Eq. Pl. s. 278–9 and n.

THE cause entitled *The Vermont & Canada Railroad Company* v. *The Vermont Central Railroad Company et al.*, was entered in the Franklin County Court of Chancery, at the June term, 1855, and by order of court is still pending.

The history of that cause sufficiently appears in the opinion. The bill in the present suit is brought in the nature of a bill of supplement to the original bill in that cause and all amendments and supplements thereto, and all petitions, decrees, orders and proceedings in said cause, making all such previous proceedings a part thereof. It is brought in the name and behalf of the Central Vermont Railroad Company, James R. Langdon and certain other owners of the various classes of bonds issued under the decrees mentioned in the opinion, who are therein named, and all other holders of such bonds. The Vermont & Canada and Vermont Central Railroad Companies, the trustees of the first and second mortgages of the Vermont Central Railroad, the advisory committee of the first and second mortgage bondholders, and certain of the holders of the first and second mortgage bonds, are made defendants.

The bill, after setting out the previous proceedings in the cause of *The Vermont & Canada Railroad Company* v. *The Vermont*

*Central Railroad Company et al.*.—from which it appears that the receivers and managers, from time to time in possession of the property, were, by various decrees and orders of the Court of Chancery, authorized to issue, and did issue and dispose of, their notes or bonds known as "funded" or "trust" loans, for the purchase of equipment and for the other purposes set forth in said orders and decrees, and to pledge, as security therefor, certain specific property—and the appointment of the Central Vermont Railroad Company, as receiver and manager in that cause, on the 21st day of June, 1873, alleges that at the time said Central Vermont Railroad Company was so appointed, there was a large floating debt outstanding against the trust, incurred by the former receivers and managers in the operation and management of the property, which said Central Vermont Railroad Company was obliged to pay, and did pay, out of its own funds, for the purpose of running and operating the roads, and that without the payment of said money said roads could not have been run and operated; that the money so advanced is still due to the orator the Central Vermont Railroad Company, and constitutes a proper debt from the trust, or trust property. That there is now a large floating debt, contracted for money borrowed for the current business of operating said railroads, and the purchase of material and supplies, and that all the debts contracted by the orator the Central Vermont Railroad Company, and the former receivers and managers, whether funded or floating, were contracted in good faith. That all said trust debts were incurred with the consent, under the authority or with the acquiescence of the Vermont & Canada and Vermont Central Railroad Companies, and the first and second mortgage bondholders of the latter company, or legitimately grew out of contracts to which they assented or in which they acquiesced. That all persons interested in said roads, whether as stockholders or bondholders, are firmly and legally bound by all the orders and decrees made in regard to said property or its management by the receivers and managers in the former cause, whether said orders and decrees were strictly judicial or not—that they bind all parties in interest as fully as if they were, and no party in interest can now be heard to claim that he was ignorant

of them or that he is not bound by them.   It insists that said fund-
ed and floating debts are in equity a first lien upon said roads and
property, or, if not, then upon the earnings and income thereof,
and are entitled to be paid in priority to the rental claims of the
Vermont & Canada Railroad Company and the claims of the first
and second mortgage bondholders; and as to the funded loan
notes secured upon specific property, that the holders, after ex-
hausting the special security pledged, are entitled to have the bal-
ance due paid out of the earnings of the roads and property in
preference and priority to the claims of the Vermont & Canada
and Vermont Central Railroad Companies, and the first and sec-
ond mortgage bondholders.   That the orator, the Central Vermont
Railroad Company, when it accepted the office of receiver and
manager, was advised and believed that the money advanced by it,
as above stated, would be a lien upon said roads and property;
and the same is declared in the order appointing it, and it would
not have accepted said office had it believed otherwise.   That the
other orators have parted with their money upon the obligatioms
of the receivers and managers in the same belief; that a large
part of the value of the roads and property consists of improve-
ments made with their money, and that nearly all the equipment
and furniture of the roads was paid for with money obtained by
the outstanding funded and floating loans.   That the orators, some
of them, represent every class of the holders of debts incurred by
the receivers and managers, and can and will represent their in-
terests fairly; and though the interest of each is separate and dis-
tinct, their rights to have an application of the trust property or
its earnings stand upon the same ground, both in fact and law;
that the number of persons holding such claims is so large as to
make separate suits by each impossible, and to save a multiplicity
of suits, the orators pray that any person or persons holding such
claims may be allowed to become parties to the bill, and that the
claims of all may be ascertained so that all may have equal ben-
efit of such relief as may be found and held appropriate.   The or-
ators pray that the accounts of the Central Vermont Railroad
Company, as receiver and manager since the 1st day of July,
1873, may be adjusted, and the amount due it ascertained; that

the holders of notes secured by a pledge of specific property may have the amount of such security ascertained and appropriated to their payment, and that after the application of such security the balance due, together with the funded and floating debt, may be decreed to be a first lien and charge upon said roads and property, and the income thereof, prior in right to any claim of the Vermont & Canada Railroad Company, or the bondholders under the first and second mortgages of the Vermont Central Railroad; that some time be fixed for the payment of said claims, and, in default, that the property be sold to pay them; or, if the court should not order a sale, that the roads and property be ordered to remain in the hands and possession of the Central Vermont Railroad Company, or some other person or party, to run and operate the same and apply the income thereof to the payment of such claims.

The answers of the trustees under the first and second mortgages of the Vermont Central Railroad admit that they believe the facts set forth in the bill are true, and that the orators are entitled to the relief therein prayed for, but that some of the bondholders think otherwise, and desire that all the bondholders should find all the protection to their rights that the facts in the case will warrant.

The joint and several answer of Judith W. Andrews, Francis A. Brooks and Edward D. Mandell admits all the allegations in the bill down to and including the decree of 1861, and that said decree was legal and binding. It admits the making of all the decrees and orders set out in the bill subsequent to the decree of 1861; but denies that they were legal decrees or orders, and claims that they had no binding force or effect except in so far as they have been ratified or assented to by the parties to be affected by them. That the receivers in possession, pending the litigation that resulted in the decree of 1861, were continued in possession for the purpose of working out the execution of said decree and the satisfaction of the rent in arrear and coming due to the Vermont & Canada Railroad Company, and for no other purpose. That the decree was fully executed and all arrears of rent to the Vermont & Canada Railroad Company paid in 1864, and that the possession of the persons before that time receivers, was, after

that, not as receivers of the Court of Chancery, but by virtue of the agreement of the Vermont & Canada Railroad Company and certain persons claiming to be a committee of the first and second mortgage bondholders. That the provisions in the decrees of 1864 and 1866, for the appointment of an advisory committee were wholly void and conferred no authority whatever upon said committee. That the decrees of 1864 and 1866 were not, in nature or character, supplemental, and could not have been lawfully entered in said cause as supplemental therein. Denies that all the holders of the first and second mortgage bonds assented to or ratified the decree of 1866. Admits that an advisory committee was elected under the decree of 1864, who attended to the duty of auditing the accounts of the receivers, but denies that any such committee has been elected since 1871. Denies that the chancellor had jurisdiction of the petition in the matter of the appointment of the Central Vermont Railroad Company as receiver and manager, and claims that said company has not any just or lawful possession of, or authority over said roads, by virtue of the order of the chancellor upon said petition. Admits the existence of a large floating debt which had been contracted by the so-called receivers and managers previous to June 21st, 1873; but denies that it was incurred in the operation and management of the Vermont Central and Vermont & Canada Railroads, or either of them, and insists that it was incurred in hiring and operating other railroads and steamboat lines. Neither admits nor denies that the Central Vermont Railroad Company advanced $1,000,000 to liquidate debts of former managers; but denies that it was under any obligation so to do, and claims that the floating debts which the Central Vermont Railroad Company may have paid were without any security in the hands of the former holders, and that that company stands in no better position in regard to the same than those to whom said debts were due and owing when paid.

The same matters of defense, substantially, are alleged in the separate answers of Francis A. Brooks and of the Vermont & Canada Railroad Company—the latter company insisting that it has, at all times, been entitled to its rent out of the gross income of the property; that its claim is in equity superior to the claims of all

other creditors, and that it has never assented to, ratified or acquiesced in any arrangement, order or decree by which its claim was waived or postponed.

It is claimed generally by the answers, by the cross-bill filed by Judith W. Andrews, Edward D. Mandell and Francis A. Brooks, by the plea of Judith W. Andrews and the demurrers of the Vermont & Canada Railroad Company, Edward D. Mandell and Francis A. Brooks, that the Central Vermont Railroad Company, for reasons stated, is incapacitated from bringing and maintaining the bill; also, that the bill is multifarious.

Many other matters are alleged in the answers, cross-bill and plea, by way of defense, which were not regarded by the court as material to the disposition of the questions presented by the bill.

An answer to the cross-bill was filed, and replications to the various answers and demurrers, and testimony was taken by the orators in support of the bill.

The cause came on for hearing at the September Term, 1878, of the Franklin County Court of Chancery, to wit on the 4th day of January, 1879; whereupon it was ordered by the chancellor that the bill be dismissed, *pro forma*, and without prejudice, and an appeal was granted to the next term of the Supreme Court for Franklin County, whence it was ordered for argument before the full bench at the General Term, at Montpelier, in October, 1879.

The cause was heard before the full bench, and was argued by the following named counsel: For the orators—Luke P. Poland and B. F. Fifield; for the Vermont & Canada Railroad Company—Aldace F. Walker and Edward J. Phelps; for certain first and second mortgage bondholders of the Vermont Central Railroad Company—Francis A. Brooks, Esq: for certain holders of equipment and income and extension bonds—James C. Barrett, Esq.; for himself, as holder of Vermont & Canada guaranteed bonds—briefly, Robert Codman. A brief in behalf of certain equipment bondholders was presented by E. R. Hard.

The cause was held for advisement until December 14th, 1880, when the opinion of the court was delivered by

ROYCE, J. The principal object and purpose of the bill is, that the amount due the different classes of claimants described in it should be ascertained, and also the order in which they should be paid, the security to which each is entitled, and the mode and manner in which the property that is the subject-matter of the litigation shall be appropriated for their payment. It is insisted by the demurrers, plea, cross-bill and answers of the defendants, upon the grounds therein alleged, that the bill is multifarious. The questions presented by it for adjudication, or some of them, are questions in which all of the orators have a common interest, and to avoid a multiplicity of suits it is allowable that all should join in a proceeding instituted for the purpose of having it ascertained what that interest is. The defendants, all and each, are entitled to make all and any defence that they might make, collectively or separately, if bills had been brought by each orator against all or each of the defendants ; so that the defendants are in no wise embarrassed in making their defense by the alleged misjoinder of the parties or causes of action. No possible advantage could be gained by compelling each of the parties interested in the subject-matter of this controversy to bring separate bills. What constitutes multifariousness has been much discussed by chancellors and elementary writers, but no rule of universal application seems to have been established. Courts, in considering the question, have regarded the convenience of the parties, as shown by the case, and whether their equitable rights could be properly protected rather than rules and precedents. Story Eq. Pl., s. 278–9, and n.

The authorities relied upon by the defendants are not in conflict with what has been stated. It is also claimed that although the special leave of the Court of Chancery was obtained to bring this bill in the nature of a bill of supplement to the original bill, the relief sought therein is not supplemental and cannot be granted. This objection is technical, and relates to the form of procedure. The reasons given by the court in *Vermont & Canada Railroad Company* v. *Vermont Central Railroad Company et al.,* 50 Vt.

500, in sustaining the right to proceed by petition in the original cause, are, in our judgment, equally applicable to the manner of proceeding here, and are a full and complete answer to the objection. The bill, then, not being demurrable for multifariousness, or as having been brought in the nature of a bill of supplement, we are brought to the consideration of the case as shown by the pleadings and proofs. In order to fully understand it, and thus be enabled to intelligently apply to it the principles of equity law, it becomes necessary to give a detailed history of the property in litigation, extending over a period of nearly thirty years, as shown by the records of the court, the action of the corporations and their officers and stockholders, the trustees, advisory committee and the receivers and managers.

In 1843 the Legislature of Vermont passed an act to incorporate the Vermont Central Railroad Company, and granted to said company the right to build a railroad from some point on the eastern shore of Lake Champlain to some point on the Connecticut River. The act incorporating the Vermont & Canada Railroad Company was passed in 1845, and granted to said company the right to build a railroad from some point in Highgate, on the Canada line, to some point or points in Chittenden County most convenient for meeting, at the village of Burlington, railroads to be built by the Champlain & Connecticut River Railroad Company and the Vermont Central Railroad Company. It was provided by the second section of the said act that if the company should not complete the road within thirteen years, the corporation should cease and the act become void. In 1849 the act was amended, extending the time within which said company was required to build its road to make said connections at the village of Burlington, to eighteen years from the 31st day of October, 1845. On the 24th day of August, 1849, the Vermont & Canada Railroad Company and the Vermont Central Railroad Company entered into a contract, under seal, in and by which the Vermont & Canada Railroad Company agreed to provide the funds and construct its railroad within such time, on such location and in such way and manner as should be conformable to its charter, and to lease the same as it was or might be located and constructed, with all

the fixtures and property pertaining to the same, to the Vermont Central Railroad Company, its successors and assigns, until the Vermont Central Railroad Company should purchase the same, or the State of Vermont should purchase the same, under the sixteenth section of the charter of said company, with the right to use and occupy the same as fully and freely as it might or could do under its charter, and any additions made or to be made thereto. And the Vermont & Canada Railroad Company covenanted that it would, at all times, continue and preserve its legal organization, and hold such meetings and pass such votes, appoint such officers and confer upon them such powers, keep such records of its proceedings and make such reports to the Legislature, or otherwise, as may be required by law. And the Vermont Central Railroad Company, on its part, agreed that when the Vermont & Canada Railroad and its appurtenances should be constructed in manner aforesaid, and ready for use, it would provide the necessary power and other equipment and operate and run the same, at all suitable times thereafter, for the accommodation of the public, and pay as rent therefor, in addition to the necessary incidental expenses of said Vermont & Canada Railroad Company, a sum equal to eight per cent. annually upon the amount of the whole cost, for the time being, of said road, its buildings, fixtures, lands and appurtenances, as the same shall have been paid by the Vermont & Canada Railroad Company ; the rent to begin on the 1st day of December then next, and to be thereafter paid semi-annually, on the first days of June and December in each year.

It will be observed that the only security that the Vermont & Canada Railroad Company obtained for the payment of the stipulated rent by this contract, was the undertaking of the Vermont Central Railroad Company to pay it, and such as the law would accord to it as lessor ; and that the rent to be paid was not made dependent upon the earnings or income of the property.

On the 9th day of July, 1850, the aforesaid parties made another contract, under seal, materially modifying the previous contract, as far as the security for the rent to become due to the Vermont & Canada Railroad Company was concerned, and as defin-

ing how the security agreed upon was to be made available. It was provided by that contract that if the rent reserved to the Vermont & Canada Railroad Company should be and remain in arrear and unpaid for the space of four months after the same should be payable, it should be lawful for the Vermont & Canada Railroad Company to enter, or take possession of, and use and run, not only the said Vermont & Canada Railroad, but also the Vermont Central Railroad, with all the property of each of said companies then owned and enjoyed by them, and used in connection with, or for the purpose of running or working each of said railroads, and having thus entered, to receive all tolls, fares and other lawful income receivable from the use of said roads, and after paying therefrom all reasonable expenses of running and working said railroads, and of making all such repairs of each of said railroads, or any buildings or structures connected therewith or used therefor, and also the cost of all such engines, cars and other furniture as may be found necessary, to apply *the residue* of its said receipts in and towards the payment of all rent then in arrear and unpaid ; and that when the rent in arrear should be paid in full by means of the *net receipts* aforesaid, or by the Vermont Central Railroad Company, the Vermont Central Railroad Company should have the right to resume the possession of said railroads, with the same rights and subject to the same duties as before such entry by the Vermont & Canada Railroad Company ; and the Vermont & Canada Railroad Company reserved its right to resort to an action at law to recover any rent in arrear if it should choose so to do. The Vermont & Canada Railroad was so far completed that the Vermont Central Railroad Company took possession of, and run and operated it under the contract of August 24th, 1849, and paid the rent reserved up to the 1st day of June, 1854.

On the 30th day of October, 1851, the Vermont Central Railroad Company executed a deed of trust and mortgage of its railroad and franchise, stations, engine-houses, shops, wood-houses, iron, sleepers and other appendages, with all the lands thereto belonging and intended for the use and accommodation of the said road, all the locomotive engines, passenger, freight, dirt,

hand and other cars, and all the other personal property belonging to said company, as the same was then in use by said company, or as the same might thereafter be changed or renewed by said company, subject to all the rights and privileges which the Vermont & Canada Railroad Company had in and to said granted premises as contained in the several indentures between the Vermont Central Railroad Company and the Vermont & Canada Railroad Company, dated August 24th, 1849, and July 9th, 1850, to three trustees, to secure the notes or other obligations of said company for the amount of two millions of dollars. Said notes or obligations were to bear date the 1st day of November, 1851, and be payable on the 1st day of November, 1861, with interest at seven per cent., payable semi-annually, with a provision that if there should be a default in the payment of interest or principal for the space of ten days, then said trustees, or their successors, might, if they should see fit, take possession of the property conveyed by said deed, and manage and control the same, and after providing for the expenses incident to working the road and to keeping it in a condition suitable for business, to apply the net proceeds to purposes of the trust.

On the 30th day of May, 1852, the Vermont Central Railroad Company executed a second deed of trust and mortgage of the same property described in the first deed of trust and mortgage, subject to said prior mortgage and to the rights and privileges of the Vermont & Canada Railroad Company to three other trustees, to secure the notes or bonds of said company to the amount of one million five hundred thousand dollars ; said bonds or notes to bear date the 1st day of July, 1852, and be payable on the 1st day of July, 1867, with interest at seven per cent., payable semi-annually.

On the 28th day of June, 1852, the Vermont Central Railroad Company surrendered and delivered possession to the trustees named in said first deed of trust and mortgage, as such trustees, all the property, rights, privileges and franchises conveyed to them by said deed, and all the rights and title which said Vermont Central Railroad Company had to run and use the Vermont & Canada Railroad, and receive the tolls thereof; to have and to

hold all of said property in conformity to the provisions of said mortgage, and for the uses and purposes mentioned in the same, and no other. Said trustees took possession of the roads and property described in said deed of surrender, and used and occupied the same. And while they were so in possession, default having been made in the payment of the rent reserved to the Vermont & Canada Railroad Company, which became due and payable on the 1st day of December, 1854, the Vermont & Canada Railroad Company brought a bill in equity returnable to the June Term, 1855, of the Franklin County Court of Chancery against the said trustees, the trustees of the second mortgage, various bondholders under both of said mortgages and other persons having, or supposed to have an interest in the subject matter of the litigation; and set forth in said bill the contracts executed between the Vermont & Canada Railroad Company and the Vermont Central Railroad Company, and alleged that the Vermont & Canada Railroad Company had done and performed all which was required of it by said contracts; also the deed of surrender by the Vermont Central Railroad Company to the trustees under the first mortgage, the fact that said trustees were in possession and that the rent due to the Vermont & Canada Company on the 1st day of December, 1854, was due and unpaid. The orator in said bill prayed that the Vermont Central Railroad Company and said trustees be ordered and decreed to pay the rent due on the 1st day of December, 1854, and in the meantime that they be allowed to enter and take possession of said roads and other property, and receive all tolls, fares and other lawful income receivable from the same, and after the payment of all necessary expenses, to apply the residue of such receipts towards the payment of all rent then due, or which might become due while they might remain in possession of said roads; or else, if it should not seem fit to the court to make such order, then that the court would appoint some suitable person, or persons, to be the receiver, or receivers, and the manager, or managers, of said roads and property then in the possession of said trustees, subject to such orders, directions, conditions, limitations and terms as the court should deem proper and necessary to secure the rights of

the orator and all others interested in the same; and that they might have such other and further relief in the premises as justice and equity might require. The defendants appeared and filed answers to the bill.

On the 17th day of May, 1855, the chancellor made an order dispossessing said trustees and putting the Vermont & Canada Company in possession of its road and the Vermont Central road and all of the personal property in the possession of said trustees and used by them in connection with said roads. The Vermont & Canada Company was required by said order to assume and pay all the liabilities of the trustees incurred in the execution of their trust, and indemnify and save them harmless against all loss, damage, cost or expense by reason of such debts or liabilities, and to pay to them all sums advanced in the execution of said trust beyond the trust fund received by them.

On the 6th day of May, 1856, the chancellor made an order restoring to the trustees of the first mortgage—who were John Smith, John S. Eldridge and Lawrence Brainerd—the possession of both of said railroads and all the property acquired by the Vermont & Canada Company, under the order of May 17th, 1855. Said trustees were ordered to hold, manage and dispose of said property and account therefor at all times, under and subject to the order of the court, and after expending from the proceeds of the earnings thereof the necessary expenses for running, operating and keeping in repair the same, and such sums as may be necessary for the purchase of new stock and equipment, and such liabilities as the former trustees and the Vermont & Canada Railroad Company are now under in respect of their former proper management thereof, to hold the residue of the earnings and profits subject to the order of the court. They were also required to give a bond for the faithful discharge of their duties. They were charged with all the duties and liabilities of receivers, and although not designated as such in the order, they were considered and treated by the court and the parties to the cause as receivers, or receivers and managers. This is evident from the order of the chancellor made December 6th, 1856, in which he says that said trustees were appointed receivers and managers of said

railroads, property and effects, on the 6th of May last, and orders them to file an inventory of the property and effects received by them of the Vermont & Canada Railroad Company.

On the 6th day of December, 1857, the chancellor appointed John G. Smith manager and receiver in the place of John Smith, deceased; and on the 25th day of March, 1859, appointed Joseph Clark receiver and manager, in place of George M. Dexter, who, it seems from the order, had been a trustee of the first mortgage, and receiver, and had resigned. In a notice signed by Lucius B. Peck, as solicitor and president of the Vermont & Canada Railroad Company, dated April 24th, 1860, requiring the defendants in the cause to appear and show cause why the prayer of the petitioner, filed in the cause, should not be granted, Lawrence Brainerd, Joseph Clark and John Smith were named as receivers and managers of the Vermont & Canada and Vermont Central Railroads. Numerous other orders were made by the chancellor during the pendency of the cause, but as they have no connection with or relation to the subject-matters now in controversy, no allusion is made to them.

The cause was finally heard at the January Term, 1861, of the Supreme Court, and remanded to the Court of Chancery with a mandate to enter a decree for the orator; and that the contracts entered into between the Vermont & Canada Railroad Company and the Vermont Central Railroad Company, on the 24th day of August, 1849, and the 9th day of July, 1850, were valid and binding; and that the Vermont & Canada Railroad Company was entitled to have the tolls and income of the said roads directed to, and applied to the payment of the rent due and growing due under said lease, for the use of said road. In pursuance of said mandate a final decree was signed by the chancellor on the 13th day of July, 1861, in which it was ordered and decreed that the possession, management and control of both of said railroads and railroad property should be continued in the then receivers, subject to the order and direction of the court, with power of removal at all times; that the receivers' accounts should be settled and the money then in their hands, and which might come into their hands, derived from the income of said roads, be paid to the Ver-

mont & Canada Railroad Company, until the amounts due and growing due to the Vermont & Canada Railroad Company, and the costs of the suit, should be paid and satisfied. The reasons and grounds for that decision and mandate are clearly and fully stated in the opinion, drawn up by Judge BARRETT, in the 34th Vt., 2.

On the 11th day of November, 1863, the Vermont & Canada Railroad Company filed a petition, addressed to the Court of Chancery of Franklin County, setting forth the previous proceedings in the cause, and that the rents provided for therein were largely increased by the cost of further construction of the petitioner's road, so that the computation for rent provided for in the lease and deed of security, was increased from $1,348,500 to about $1,700,000, and that still further large sums for costs of construction were in course of expenditure; that there was then due to the petitioner for rent in arrear, about $950,000; that the *net income* of the roads and property was insufficient, and would be for many years, to pay accruing rents and rents in arrear; that the whole or principal part of the first mortgage bonds were due and unpaid; that the Vermont Central Railroad Company was insolvent and had no means with which to pay, except net income; that disastrous litigation existed; that the petitioner's stock and the bonds had depreciated in value, and that to settle all matters in controversy, and to increase the value of both the stock and bonds, they, and a very large proportion of the holders of the first mortgage bonds, acting by their agents and attorneys, O. W. Davis, Joseph Andrews and Otis Drury, had entered into an agreement which provided:

First,—That the capital stock of the Vermont & Canada Railroad Company should be at once increased to two million dollars, and on such increase dividends should be payable, commencing on the 1st day of April, 1863.

Second,—That the sum of $71,800 should be paid by the trustees of the first mortgage to the Vermont & Canada Railroad Company, at such time as the trustees might be able to do so without delaying the construction of the road from Swanton to Canada line.

Third,—That the road from Swanton to Canada line was to be built without delay from the funds in the hands of the receivers and trustees, and as expenditure should be made therefor, stock of the Vermont & Canada Railroad Company was to be issued to the holders of the first mortgage bonds, as they might determine to receive the same, either by subscription or in payment of interest coupons, with a proviso that the stock so to be issued should not exceed $250,000.

Said agreement was made subject to the approval of the stockholders of the Vermont & Canada Railroad Company, and on condition that such a decree should be obtained in a suit then pending—the bill for that purpose to be amended if necessary—as should render the adjustment legal and binding on all parties interested in both of said roads, that such legislation should be obtained as would render said agreement legal, and that, if ratified and carried out, it should be in full discharge and settlement of all claims in favor of either class of bondholders against the Vermont & Canada Railroad Company, and of all matters of dispute between said parties. The agreement also provided for the settlement and payment of the incidental expenses of the Vermont & Canada Railroad Company out of the trust funds; that all suits and actions against the Vermont & Canada Railroad Company and the trustees of the first mortgage should be discontinued, and the costs of all suits pending and the expenses of the committee of the first mortgage bondholders should be paid out of the trust fund. The petition further alleged that the parties represented by said agreement were desirous that it should be carried into full and final execution; that the Legislature of the State, by an act approved November 4th, 1863, had authorized the Vermont & Canada Railroad Company to convert its back rent into stock and to increase its capital stock for that purpose, on such terms as the Court of Chancery, having jurisdiction in the cause then pending in Franklin County should deem just and equitable, for the purpose of carrying said adjustment into effect; and that proceedings might be had under the power and authority conferred by the act by a petition in said cause, by any party thereto, without the dilatory and formal proceedings usual in cases of

bills and other pleadings in equity. The stockholders of the Vermont & Canada Railroad Company, at a meeting called for that purpose, on the 1st day of October, 1863, approved and adopted said contract of settlement, with certain unimportant modifications, and at a meeting appointed for the 5th day of November, 1863, adopted a resolution that, " with the view and for the purpose of enabling this company to carry out the compromise made with the committee of the first mortgage bondholders and the Vermont Central Railroad Company, the act of the Legislature of Vermont, approved November 4th, 1863, is hereby accepted."

At a term of the Court of Chancery, holden on the 19th day of January, 1864, it appearing that the order of notice made by the chancellor had been complied with, the petition came on for hearing. The Vermont & Canada Railroad Company, Vermont Central Railroad Company, Brainerd, Clark and Smith, (the then receivers,) and Silas Pierce, a bondholder, appeared by their respective solicitors, and O. W. Davis, Joseph Andrews, Otis Drury, Geo. M. Dexter and Estes Howe appeared in person; and no objection being made to the granting of the prayer of the petition, and it appearing that the matters stated in the petition were true, and that carrying the adjustment set forth in the petition into effect would be just and equitable to all parties interested in said roads and property, it was ordered and decreed that the Vermont & Canada Railroad Company might increase its capital stock to such an amount that its capital stock should be two million dollars, and that that sum should be the basis for the computation of the rent provided for in the original lease, except as thereinafter provided; that said rent should be chargeable upon the whole property and income of said roads, and that said rent should be paid by the trustees and receivers from time to time in possession of said roads and property, and from the income thereof, so far as the same can be earned; that the incidental expenses of the Vermont & Canada Railroad Company, the costs and expenses in suits which were ordered to be discontinued, the reasonable charges and expenses of the committee of the first mortgage bondholders, and the future services and expenses of the advisory committee should be paid by the trustees and receivers; that the trustees and

receivers should, within three years from the 1st day of June, 1864, pay the Vermont & Canada Railroad Company the sum of $97,000, with interest from said 1st day of June, and that the Vermont & Canada Railroad Company should not demand or receive any further or other sum, for, or on account of any rent or interest in the premises, then due or outstanding in its favor, prior to June 1st, 1864, or for any incidental expenses prior to June 1st, 1863. That additional stock might be issued by the Vermont & Canada Company, if it should be required, to pay the expense of constructing any road that it was, or should be, by law compelled to build, and that said stock should stand the same as the stock previously issued ; that O. W. Davis, Joseph Andrews and Otis Drury, the then committee of the first mortgage bondholders, and their successors as such committee, who should be appointed annually by such bondholders, at a public meeting called upon reasonable notice for that purpose, should constitute an advisory board, in respect to the management of said roads and property, with a right to advise the trustees and receivers in respect thereto, and with a right to inspect the books, papers and accounts of the trustees and receivers. And said committee were constituted the auditors of the accounts of the trustees and receivers, and if they should approve of the same, they were to be allowed to pass without further proceedings, but if they should not approve of any part, the usual reference was to be made for examination and decision by the court ; that the trustees should annually print and distribute to all the first mortgage bondholders, whose names and residence should be known to them, a report of the earnings and expenditures of said business, with a statement of its affairs and prospects in general for the year preceding such report ; that all suits pending, (except one in Chittenden County Court of Chancery,) respecting said roads and property, either against the Vermont & Canada Company or the trustees and receivers, should be discontinued ; that the trustees of the second mortgage, the Vermont Central Railroad Company and Vermont & Canada Railroad Company, should have the right at all times to object to any part of the accounts of the trustees and receivers before the same were passed upon by the court. That the cause in which the petition

was filed should be continued on the docket of the Court of Chancery, and that any party in said cause should be at liberty to apply to the court from time to time for further orders in the premises, as they might be advised.

On the 20th day of February, 1866, the trustees of the first and second mortgages, and certain bondholders under both mortgages, brought a bill of complaint against the Vermont & Canada Railroad Company, Vermont Central Railroad Company and a large number of the bondholders under both mortgages, returnable to the April term, 1866, of the Franklin County Court of Chancery, setting forth that the trustees of both mortgages and a committee of the two classes of bondholders had entered into an agreement to settle and adjust certain doubts and difficulties as to the rights of the two classes of bondholders and as between each other, and praying that the provisions of that agreement might be decreed to be enforced and carried into execution. Service of the bill was made upon the Vermont & Canada Railroad Company and the Vermont Central Railroad Company, and an order of notice was made as to the other defendants. The bill was returned to the aforesaid term of the Court of Chancery, and it appearing that the order of notice had been complied with, and none of the defendants appearing or making any answer to the bill, it was ordered and decreed that the bill be taken as confessed as to each and all of them. A decree was drawn up and signed on the 14th day of April, 1866. The decree provided for the issuing of new coupons and bonds in substitution for those first issued, extending the time of payment of both classes of bonds, and fixed the time of payment. It expressly recognized the prior and paramount rights of the Vermont & Canada Railroad Company, as provided for in its lease, and the instruments in addition thereto, and in the decrees of the Court of Chancery theretofore rendered in this cause, which were to be recognized and preserved inviolate, and it directed as to payments to be made to the first and second mortgage bondholders out of the trust funds, after paying all sums which the Vermont & Canada Railroad Company should be entitled to. It further provided that the advisory board, provided for in the decree of January 19th, 1864, should

thereafter, and until otherwise ordered, be constituted of two first mortgage bondholders and one second mortgage bondholder.

On the 4th day of August, 1865, the receivers filed a petition in the original cause, setting forth the gross income and expenses of said roads and property for the years 1864 and 1865, the necessity for further improvements in the property and the purchase of cars and engines, and setting forth why said improvements were required and such additional cars and engines needed ; at what points the improvements should be made, the kind and character of such improvements, and the number and kind of engines required ; that they had no funds with which to pay for such improvements and equipment, that the accruing and expected earnings of the property, over expenses, would not, for a very considerable time, be sufficient to provide for such improvements and equipment, and that the use of the same for such purposes would necessarily require the suspension of the payment of dividends and interest provided for in the decrees before made and secured on said roads and property. The petition prayed that the court would, upon due notice to the parties, and upon hearing, order and direct that for the uses set forth in the petition the sum of $700,000 might be raised and obtained by them, in such manner, for such time, at such rate of interest and under such provisions as to the securing, paying, liquidating, funding or capitalizing the same, or any part or class thereof, as to the court should seem meet, and that such further order and direction might be made as to the court should seem fit. The petition was presented to the chancellor at chambers on the 10th day of August, 1865. Notice was ordered by the chancellor to be given to the Vermont & Canada Railroad Company, the Vermont Central Railroad Company, the committee of the first mortgage bondholders and the trustees of the second mortgage and committee of the second mortgage bondholders, by delivering a copy, with the order of the chancellor, to each, and that the petition should stand for hearing on the 31st day of August, 1865. The hearing was continued to the 7th day of September, at which time, it appearing that the order of notice had been complied with, and the Vermont & Canada Railroad Company having appeared by its solicitor and

a majority of its directors, and the Vermont Central Railroad Company by its solicitor, and J. M. Pinkerton and W. C. Smith in person, and R. F. Taylor and others by a communication in writing, from E. J. Phelps, their solicitor, having informed the court that they do not object to the granting of the prayer of the petition, and the receivers having appeared in person and by their solicitor, and proofs having been heard in support of the petition, and counsel having been heard thereon, and it having then been made manifest to the court that the matters stated and set forth in the petition were true, it was ordered and directed that the receivers be authorized to borrow such sums, not exceeding in the whole $700,000, as should in their judgment be necessary for the uses and purposes set forth in the petition. And in order to raise said money, if practicable, without embarrassing or suspending the payment of rents, dividends or interest named in the decrees before passed in the cause, it was ordered and directed that the receivers and managers be authorized and empowered, as such, to issue and dispose of their promissory notes for such sums and on such time, or times, not exceeding ten years from the date thereof, at such rate of interest, not exceeding eight per cent. free from income tax, and payable at such places and times as they might judge expedient, and specially to pledge and secure a lien upon the engines and cars which had been added to the equipment of the line since January 1st, 1864, with all the cars and engines to be purchased with the funds so raised, for the ultimate payment of said notes and interest; and to set aside from year to year as a fund, wherewith primarily to meet and liquidate said interest and principal, as the same should become due, the car service (so called,) of all said engines and cars so pledged for the security of said notes and interest. And that the sum so set aside should be used to pay off the interest as it might accrue, and the balance to constitute a sinking fund wherewith to pay off and extinguish said loan and notes when due, with leave to the receivers and managers to use said sinking fund in the purchase of said notes before due, or to invest the same in public securities. And if the interest or principal of said notes should not be paid when due, the holders were given liberty to apply to the court for relief by

the enforcement and realization of said securities. And in case the receivers and managers should not be able to raise money in the manner indicated, they were authorized to make such temporary loans as might be needful, on the credit of the funds and assets of said receivership and management, and to repay the same out of any earnings accrued or to accrue from the business of the line.

On the 15th day of April, 1867, the receivers, as such, and as trustees of the second mortgage, filed a second petition in the cause, setting forth that the erection of depots and machine shops under the direction of the court, had, by the unexpected increase of cost of material and the price of labor, increased the expenditure therefor by quite a large amount. That they found the interest of the roads and property in their management made it absolutely necessary for them to obtain control and management of a branch road running easterly from St. Johns, Canada, called the Stanstead, Shefford and Chambly Railroad, and that this could only be done by purchasing the stock of said road, and the bonds secured by a mortgage thereon, which required an expenditure of about $364,000. Also, that the necessity of such purchase was assented to and approved by all parties interested in said trust; that they had been compelled to expend the income and earnings of the property for other purposes necessary to its safety and protection, and that, as a result of all such expenditure, they were then under liabilities for the trust of about $753,302.98. That on the 1st day of June, 1867, the $97,000 ordered by the decree of 1864 to be paid to the Vermont & Canada Railroad Company, would become due and payable, with interest; that the dividends to the Vermont & Canada Railroad stockholders, and the interest on the first and second mortgage bonds, would become due at the same time, and that the interest on the equipment loan, authorized by the decree of 1865, would become due on the 1st day of May, 1867—making a total of liabilities due, or to fall due by said 1st day of June, of $1,142,802.98. That most of the expensive erections, and the new road built, were upon the Vermont & Canada Railroad, and had added materially to its cost and value. That for the purpose of providing means to meet said existing and maturing liabilities, they

and the authorized representatives, agents and committees of all
the different interests in the said trust property, had agreed upon a
plan which provided that the stock of the said Vermont & Canada
Railroad Company should be increased $250,000, to be used to pay
the sums then due the Vermont & Canada Railroad Company, and
the dividends to fall due June 1st, 1867, and the balance to be used
by the managers in liquidation of the claims against the trust.
That the managers be authorized to issue obligations or notes with
coupons attached, payable semi-annually at seven per cent. interest,
to run twenty years from date, secured by a pledge of the stock
and mortgage bonds of said Stanstead, Shefford & Chambly Rail-
road Company, the first and second mortgage bondholders to accept
the said notes in payment of the interest due on said bonds on the
first days of June and December, 1867, and the second mortgage
bondholders to take $150,000 of said notes, and pay the managers
in cash for them ; the balance of said notes to be used by the man-
agers for the liquidation of debts against the trust; and that the
managers be authorized to issue $300,000 of notes in addition to
those issued by them under the decree of the court, known as the
" equipment loan," and upon the same general terms and conditions,
to be secured by the stock of said road ; and praying that a decree
be made confirming said agreement.   An order of notice was made
by the chancellor, and the petition stood for hearing on the 1st
day of May, 1867, at which time, it appearing that the order of
notice had been complied with, and the trustees of the second
mortgage, and the persons constituting the advisory board of the
first and second mortgage bondholders, the parties named in the
said order and petition, having duly appeared, and one stockholder
in the Vermont & Canada Railroad Company, and a holder of part
of the equipment loan having appeared by counsel, and upon proof
produced in support of the petition, the court found and adjudged
that all the facts set forth in the petition were true ; and it having
been proved that at a duly notified meeting of the stockholders of
the Vermont & Canada Railroad Company it was voted that the
stock of the company be increased $250,000, it was adjudged and
decreed that the stock of the Vermont & Canada Railroad Company
be increased $250,000, said stock to be delivered to the receivers

and managers to deliver to said Vermont & Canada Railroad Company enough of said stock to pay the $97,000 which was ordered to be paid to it by the decree of 1864, with interest, and to pay with said stock the dividends due the Vermont & Canada Railroad stockholders on the 1st of June, 1867, and the proceeds of the balance of the stock to be appropriated by them to the payment of the liabilities against the trust; said increase of stock to be in full for all expenses and payments for construction and erections upon or for said Vermont & Canada Railroad to that time; and that nothing therein contained should be construed as impairing the right of the Vermont & Canada Railroad Company to its right of priority of payment from the income and earnings of said roads, as established by former decrees. That the managers be authorized to issue obligations or notes to run twenty years from date, with interest at the rate of seven per cent., payable semi-annually, for the sum of $500,000, to be secured by a pledge of the stock and mortgage bonds of the Stanstead, Shefford and Chambly Railroad Company, and all of the net earnings of said road, the receivers and managers to hold and retain in their hands as a security for the accruing interest on said notes, and the payment of the principal, when due, all of the said stock and bonds and the net earnings and income of said road, to be strictly kept apart for the payment of said interest and notes; the holders of the first and second mortgage bonds to accept said notes in payment for the interest falling due on said bonds on the first days of June and December, 1867, the second mortgage bondholders to take $150,000 of said notes, and pay the managers cash for the same, and the balance of said notes to be used by the managers for the liquidation of debts against the trust; and to issue the further sum of $300,000 in notes, at a rate of not exceeding eight per cent. interest, to run not exceeding ten years from the date thereof, in addition to those issued by them under a former decree of the court, made September 7th, 1865, and known as the " equipment loan," and upon the same general terms and conditions, to be secured by a pledge of the engines and cars pledged by that decree, and certain engines and cars that had been added to the equipment since September 7th, 1865, and the same provision for setting aside the car service

as a sinking fund as was contained in that decree; the avails of such notes to be applied by the receivers and managers to the extinguishment of liabilities against the trust.

At a meeting of the directors of the Vermont & Canada Railroad Company, holden on the 11th day of April, 1867, the following preamble and resolutions were passed:

WHEREAS, The committee of the first and second mortgage bondholders of the Vermont Central Railroad Company have this day communicated, through its president, a proposition looking to the funding of the entire floating indebtedness upon the property, and to the regular continuance of the payment of rents upon the Vermont & Canada Railroad stock, and the interest upon the several classes of bonds, and as a part of said plan proposing that this company should increase their capital stock $250,000 in consequence of increased length of road and permanent improvements to the property of this company. It is therefore voted that the directors hereby signify their approval of the proposition submitted, and that a meeting of the stockholders of this company be notified to be held on the evening of the 22d inst., to consider and act upon the proposed increase of capital stock. That this company will join with the parties in interest in a petition to the Court of Chancery of Vermont, for such order and proceedings as will secure the end contemplated in said proposition, and that the clerk call a special meeting of the stockholders, to be held on the 22d day of April, 1867, at 8 P. M.

A meeting of said stockholders was called and held agreeably to said vote, at which it was voted to increase the capital stock of said company $250,000.

On the 16th of August, 1867, the receivers and managers, as such, and as trustees of the first mortgage, filed a petition in the cause, praying, for certain reasons stated, that Lawrence Brainerd and Joseph Clark, two of said receivers and managers, might have leave to resign and be discharged, and that their accounts as such might be settled and passed, and that B. P. Cheney and R. F. Taylor might be appointed. Also, that the said Brainerd and Clark and J. Gregory Smith, trustees of the first mortgage, and their successors, be and constitute, with said Smith, Cheney and Taylor, receivers and managers, a board of management, (any three of whom shall be a quorum,) with power to make all needful rules and regulations for the management of the property, and

to run, manage and operate the same under the decrees, orders and limitations before made in the cause. On the 16th of August, 1867, this petition was presented to the chancellor, and he, having found that notice thereof had been given to the proper parties in said cause, and no one objecting thereto, and the matters stated therein appearing to be true, directed an order and decree in substantial accordance with the prayer of the petition.

On the 18th day of May, 1868, a petition was filed in the cause by Brainerd, Clark, Smith, Cheney and Taylor, representing that Smith, Brainerd and Clark were trustees of the first mortgage, that Smith, Cheney and Taylor were receivers, and that they, with said trustees, constituted a board of management of said railroads —setting forth that they, and a committee of directors of the Vermont & Canada Railroad Company and of the first and second mortgage bondholders, and certain holders of the equipment loan, had entered into an agreement for the modification of the decrees before made, in the provisions made by them in relation to a sinking fund, and giving authority to the trustees and managers to extend the time of payment of the notes or bonds before that time given, by the giving by them of new notes or bonds with the same liens and securities and at the same rate of interest, and praying that said agreement might be ratified and confirmed, and the two former decrees so far modified as to conform to the same. An order of notice was made and the petition set for hearing on the 22d day of May, 1868, at which time, it appearing that the order had been complied with, and the Vermont Central Railroad Company appearing by its president, and the Vermont & Canada Railroad Company and the other parties to said agreement appearing by their solicitors, and it appearing that the facts set forth in said petition were true, it was ordered and decreed that the articles of agreement are hereby ratified and confirmed, and the decrees of September 7th, 1864, and May 1st, 1867, are hereby modified. The car service mentioned in said decrees was limited and defined, and after deducting from such service the accruing interest and the expense of keeping such cars and locomotives in repair, if, in the judgment of the trustees and managers, the interest of the roads should require it, they were authorized to invest the remain.

der in additional equipment; but if such remainder should in any year be less than $50,000, it was to be made up from the funds of the road to that sum. The additional equipment so to be obtained to be and remain a security to the notes issued under said decrees; and authority was given to the trustees and managers to extend the time of payment of the notes or bonds, as prayed for.

At a term of the Court of Chancery, holden at St. Albans, in the County of Franklin, on the second Tuesday of April, 1869, the trustees and managers preferred a third petition to said Court, setting forth that they had been compelled to make large and necessary expenditures in repairing the bridge at Rouses Point, and enlarging the docks at Burlington, and in putting new and additional equipment on to said roads and that farther equipment must be immediately added; that they had consulted with the Vermont & Canada Railroad directors and the committee of the first and second mortgage bondholders and many other persons interested in the trust, and that they all concurred in thinking that they should be authorized to borrow money to pay said indebtedness and to provide said equipment; and praying that they might be authorized to borrow $500,000 and thereafter another $500,000, if said committee should concur with them in thinking the interest of the trust required it. The petition came on for hearing at said term, and it appearing that the directors of the Vermont & Canada Railroad Company, at a meeting held on the 9th day of April, 1869, voted to assent to a further issue of equipment bonds, not exceeding $1,000,000, and the committee of the first and second mortgage bondholders appearing by their solicitor and making no objection to the prayer of the petition, and several other persons largely interested in the trust property, and the Vermont Central Railroad Company and the petitioners appearing by their solicitors and making no objection to the prayer of the petition, and it appearing that the debt against the trust ought to be paid and new and additional equipment procured, the court, on the 13th day of April, 1869, ordered that the receivers and managers be authorized and empowered to borrow immediately $500,000, and in order to raise said money, to issue and dispose of their promissory notes on such time not exceeding twenty years, and at a rate not exceeding

eight per cent. interest, and to pledge as a security for the same, certain equipment and the car service of said equipment, such car service to be set aside and used, first, to pay off such interest as it becomes due; second, to pay the expense of keeping such equipment in repair; the balance to be set aside as a sinking fund, with the right to invest it in additional equipment, as provided in the decree of May 22d, 1868, with the right to raise $500,000 more in the same manner, if, in their judgment and that of the committee of the first and second mortgage bondholders, it should be deemed advisable, and to pledge as security for the same certain other equipment and the car service of the same, provided for as a sinking fund. Said committee and said receivers and managers, on the 28th day of October, 1869, executed an instrument in writing of that date, in which, after referring to said decree, they say:—

" Whereas, it was further provided in said decree that one-half of said bonds might be immediately issued, and the other half whenever, in the judgment of the said managers and of the committee of the first and second mortgage bondholders, the interest of said roads might require; now, we, after due consideration of the premises and interests of all concerned, do assent to the issue of the balance of said loan in bonds like those previously issued."

On the 1st day of March, 1870, the chancellor made an order accepting the resignation of R. F. Taylor as receiver and manager, and discharged him from said office.

On the 16th day of May, 1871, the trustees and managers filed a petition in the cause, setting forth that they had made large expenditures in the construction of the Burlington and Swanton branches of the Vermont & Canada Railroad, and that there remained due from the Vermont & Canada Railroad Company, on account of such expenditures, $500,000, which was not represented by any stock of said company. That they had made large expenditures in improving the Vermont & Canada and Vermont Central Railroads, and in procuring additional equipment, and as the result, there was outstanding a floating debt against them of $1,500,000, and that it was important that the debt should be funded or paid; and praying that the Vermont & Canada Railroad Company issue additional stock to the amount of $500,000

17

and deliver the same to them, and that they be authorized to issue their notes for $1,000,000 payable in twenty years, with interest at eight per cent., payable semi-annually, the Vermont and Canada Railroad Company to endorse and guarantee said notes, and that they be empowered to indemnify the Vermont & Canada Railroad Company against its endorsement and guaranty. The petition came on for hearing on the 17th day of May, 1871, and, it appearing that the Vermont & Canada Company, by its stockholders' vote, had voted to issue its additional stock and endorse and guarantee the notes of the trustees and managers in accordance with the proposition contained in the petition, that the Vermont Central Railroad Company had, by stockholders' vote, approved of and assented to the said proposition, and both companies appearing by their solicitors, and assenting that the prayer of the petition be granted, and the committee of the first and second mortgage bondholders appearing and assenting to the same, and it appearing that the facts stated in the petition were true, it was, on said day, ordered and decreed that the Vermont and Canada Railroad Company issue its additional stock to the amount of $500,000, and deliver the same to said trustees and managers on account of the expenditures made by them in the construction of said branches, the expenditure so made by them to be a part of the cost of the construction of the Vermont & Canada Railroad, and the stock representing such expenditure to be entitled to dividends and the same priority of right as the outstanding stock ; and the trustees and managers were authorized to issue their notes to the amount of $1,000,000, payable in twenty years from date, at eight per cent. semi-annually, and to indemnify the Vermont & Canada Railroad Company against its endorsement and guaranty of said notes by a proper contract, stipulating, among other things, that on their failure so to do, the Vermont & Canada Railroad Company should have the right to apply for a summary order, on petition for relief in this cause, to protect it against such liability, and for such appropriation of the earnings of the road as to the Court should seem equitable. At a stockholders' meeting of the Vermont & Canada Railroad Company, holden on the 16th day of May, 1871, it was voted to increase the stock of

the Vermont & Canada Railroad Company, and endorse and guarantee the notes of the trustees and managers as authorized by said decree, and the treasurer of the company was authorized to execute said endorsement and guaranty, and for that purpose to use the seal of the company; and John Porter, the vice-president of the company, was requested to see to the execution of the contract provided for by said decree, and accept the same on behalf the company. At a directors' meeting of said company, holden on the 24th day of October, 1871, the said Porter, having procured such a contract signed by the trustees and managers and approved by Otis Drury, for the first and second mortgage bondholders, submitted said contract and it was adopted and ordered to be recorded in the books of the company.

On the 15th day of April, 1872, the trustees and managers filed a petition in the cause setting forth that the loan of $700,000, issued by them on the 1st of November, 1865, would fall due on the 1st day of November, 1875, and that provision should be made for its payment; that there was then outstanding against them a large debt in the form of a temporary loan, which had been increased by the necessary purchase of property upon the lines of railroads leased by them, which leases had been sanctioned by the court, and that further equipment was required; and praying that they might be authorized to issue their notes for an amount not exceeding $2,500,000 for the purpose of retiring said loan of $700,000, and for the other purposes named in the petition. An order of notice was made, and the petition ordered to stand for hearing on the 20th day of April, 1872, at which time, it appearing that the order of notice had been complied with, and the Vermont & Canada and Vermont Central Railroad Companies appearing, by their presidents, and two of the committee of the first and second mortgage bondholders having, by their certificates attached to said petition, assented to the granting of the prayer thereof, that said temporary loan was necessary, and that more equipment was required, and generally that the prayer of the petition ought to be granted, it was ordered and decreed that the trustees and managers be authorized to issue their notes for an amount not exceeding $2,500,000, payable in not exceeding thirty years from

date, with interest not exceeding eight per cent., payable semi-annually, for the purpose of retiring the notes embraced in the $700,000 loan issued November 1st, 1865, and for the other purposes stated in the petition, and to pledge as security for the same the engines and cars covered by the decree of September 7th, 1865, with a provision that as fast as any portion of the $700,000 loan should be retired with funds or notes authorized by this decree, the holders of notes issued under this decree shall succeed and be subrogated to the same lien and security upon said engines and cars as is possessed by the holders of the notes embraced in said $700,000 loan ; and that the notes issued should constitute a lien and charge upon the trust property and the earnings thereof.

There was issued and negotiated, under the decree of September 7th, 1866, $700,000 of bonds, and $680,900 of those were exchanged for the bonds authorized to be issued under the decree of April 20th, 1872.

Under the decree of May 1st, 1867, $300,000.

Under the decree of May 1st, 1867, (S., S. & C. R. R. loan,) $444,400.

Under the decree of April 13th, 1869, $1,000,000.

Under the decree of May 17th, 1871, $904,000.

Under the decree of April 20th, 1872, $1,008,600, besides the $680,900 exchanged for the bonds issued under the decree of September 7th, 1866.   Said bonds are all outstanding, and default was made in the payment of interest on them November 1st, 1876.

On the 11th day of February, 1870, at a meeting of the directors of the Vermont & Canada Railroad Company, a committee was appointed and invested with the full powers of the corporation, to negotiate, in conjunction with the trustees and managers of the Vermont Central and Vermont & Canada Railroad Companies, any and all contracts or business arrangements with any connecting railroads that in their judgment might be for the best interest of that company, or of the line of road of which the Vermont & Canada Railroad formed a part, and to negotiate and arrange with said trustees and managers to carry out and perform said contracts in behalf of said company.

On the 24th day of February, 1870, the committee so appointed and the trustees and managers entered into a contract with the Ogdensburg & Lake Champlain Railroad Company, by which the Vermont & Canada Railroad Company and the trustees and managers, in consideration of certain rent by them agreed to be paid to the Ogdensburg & Lake Champlain Railroad Company, acquired the right to the possession, use and control of said road and all its property and franchises for the term of twenty years from the 1st day of March, 1870, and said committee, at a meeting of the directors of said company, holden on the 18th day of May, 1870, were constituted a committee to obtain from said trustees and managers an agreement absolving said company from all liability in so far as their names may have been used in the leasing of the Ogdensburg & Lake Champlain Railroad ; and at a meeting of said directors, holden on the 20th day of October, 1870, the action of said committee in entering into said contract and the contract of indemnity obtained by them from the trustees and managers, was approved.

On the 30th day of December, 1870, the trustees and managers took a lease of the Rutland Railroad for the term of twenty years, commencing on the 1st day of January, 1871, and at a meeting of the directors of the Vermont & Canada Railroad Company, holden on the 5th day of January, 1871, it was resolved that the action of the trustees and managers in entering into said contract, is hereby approved, and the assent of this company is hereby given for the approval of the same by the court. And on the 23d day of January, 1871, the trustees of the two mortgages of the Rutland Railroad gave their assent in writing to said contract, or lease, but without affecting the mortgage of its personal property.

On the 28th day of November, 1870, the trustees and managers took a lease of the Missisquoi Railroad for the term of twenty years, commencing from the time when said road should be completed.

On the 24th day of February, 1871, the trustees and managers, in conjunction with the Nashua & Lowell, the Boston & Lowell and the Northern Railroad Companies, entered into a contract with the Northern Transportation Company of Ohio, by which

they agreed to aid said transportation company in maintaining a line of boats for the transportation of passengers and freight to and from Ogdensburg.

On the 26th day of February, 1870, the trustees and managers filed their petition in the cause, praying that the court would approve, ratify and confirm their action, in entering into such contract with the Ogdensburg & Lake Champlain Railroad Company, and on the 1st day of March, 1870, it was ordered and decreed by the chancellor that their action in entering into said contract is hereby ratified, approved and confirmed in all respects, and they are hereby directed to go on and execute the same. On a like petition filed by the trustees and managers on the 20th day of December, 1870, they were, on the 26th of said December, by the chancellor, authorized to enter into said contract with the Missisquoi Railroad Company. On the 5th day of January, 1871, the trustees and managers filed their petition in the cause, praying that the court would approve their action in entering into said contract with the Rutland Railroad Company, and on the same day, it appearing that the boards of directors of the Vermont Central and Vermont & Canada Railroad Companies, and the committee of the first and second mortgage bondholders had assented to an order of the court approving the same, it was ordered and decreed that their action in entering into said contract be approved, ratified and confirmed, and they were directed to go on and execute the same. The committee of the first and second mortgage bondholders assented in writing to the contract made by the receivers and managers and the Vermont & Canada Railroad Company with the Ogdensburg and Lake Champlain Railroad Company in the matter of the issue of $600,000 of bonds by the latter company for the purpose of controlling the fleet of steamers running from Ogdensburg west, on the 10th day of September, 1871. The trustees and managers filed a petition in the cause on the 18th day of September, 1871, praying that the court would approve, ratify and affirm their action in making said contract with the Northern Transportation Company, and on the same day, it appearing that said contract had been approved by the committee of the first and second mortgage bondholders, it was ordered

and decreed by the chancellor that their action in entering into said contract be approved, ratified and confirmed.

Reports were made by the receivers and managers to the committee of the mortgage bondholders from 1864 to 1873, showing the financial condition of the property, its earnings and the expenditures in its management.

At the first meeting of the first mortgage bondholders after the provision in the decree of 1864 providing for the appointment of an advisory committee, for the purpose of electing such a committee, it was resolved that such committee, when elected, should continue in office until others should be chosen. That meeting was holden on the 23d day of January, 1864, and the first advisory committee of three was then elected. In 1865 a like advisory committee was elected, and after that, and down to 1870, a committee consisting of two of the first and one of the second mortgage bondholders, as provided in the decree of 1866, was annually elected. It does not appear that any advisory committee was elected after 1870, but the persons elected in that year continued to act as such committee.

This constitutes all of the history of the property that it is deemed needful for present purpose to notice. The receivers appointed upon the petition of the Vermont & Canada Railroad Company in 1861, and those succeeding them by appointment of the Court of Chancery, in connection with the persons and their successors whose appointment was authorized by the decree of August 16th, 1867, and who were, with the receivers, constituted a board of management, remained in possession of said roads and property, and run, operated and managed the same down to the time when the Central Vermont Railroad Company was appointed receiver and manager, on the 21st day of June, 1873.

Upon the facts above stated and the evidence introduced bearing upon the questions in issue, the rights of the respective parties are to be determined. And first, as to the mortgage bondholders: No question is made as to the validity of both issues of said bonds, or as to the trust deeds that were given to secure them. The only question is, what security the holders of said bonds now have upon which they are entitled to rely for their payment. It is claimed

for the holders of said bonds that the securities originally given remain intact; that they are unaffected by anything that has transpired since in the creation of the various classes of indebtedness which are represented in the bill as funded, trust and floating debts. It is claimed by the orators that the holders of the funded, trust and floating debts have priority to the right of the bondholders, and that the property should first be made chargeable for the payment of those obligations. It is admitted that while the receivers, under the decree of 1861, were administering the property which was the subject-matter of their receivership for the uses and purposes indicated by that decree, all debts properly contracted by them as receivers, or which were authorized by the court to which they were accountable, and which appointed them, would constitute a first lien upon the property they were administering. We have seen that the purpose and object to be answered by that decree in continuing the management, possession and control of said railroads in the receivers, was to earn income with which to pay the rent due, and which might grow due to the Vermont & Canada Railroad Company, so that until that object was fully accomplished, or the receivers were discharged by the parties or order of the court, they would continue strict receivers, and be entitled to the rights and protection which the law accords to such receivers. The first equipment bonds were issued under the decree of September 7th, 1865, and it is claimed by the orators that there was $97,000 of rent then due to the Vermont & Canada Railroad Company that the receivers had been ordered to pay out of net income, and hence that that series of bonds amounting to $700,000 was a receivership debt. It is claimed by the defendants that the payment of the $97,000 then due to the Vermont & Canada Railroad Company had been so provided for by the decree of 1864 that the receivers were relieved from all duty respecting it, and that after the decree of 1864 there was no occasion or necessity for the continuance of the receivership, and that it was then legally terminated; but, in our judgment, the right of the holders of those bonds, as well as all of those that were subsequently issued, to priority of security to the holders of the first and second mortgage bonds, does not depend upon the question

whether the bonds so issued were strict receivership debts or not.

In the petition that resulted in the compromise decree of 1864, the Vermont Central Railroad Company, the trustees under both mortgages, the committee of the first mortgage bondholders and certain mortgage bondholders were made defendants. Ample notice was given of the pendency of the petition. In the decree which was signed, provision was made in the eleventh article for the appointment of the advisory committee before mentioned, to represent the interests of the first mortgage bondholders, which article was amended in the decree of 1866, by providing that two of said committee should annually be chosen by the first mortgage bondholders and one by the second. Ample notice was given to the trustees of both mortgages, and the committee of the first mortgage bondholders, of the pendency of the petition praying for authority to issue the first equipment loan bonds, and no objection was made to the granting of the prayer of the petition. Notice was given to the trustees of the second mortgage, and the committee of the first and second mortgage bondholders, of the pendency of the petition asking for authority to issue the second equipment loan bonds, and they appeared at the hearing; and it does not appear that they, or either of them, objected to the prayer of the petition being granted. No notice appears to have been given of the pendency of the petition under which the decree was made authorizing the third equipment loan, but it does appear that the committee of the first and second mortgage bondholders, and certain other persons largely interested in the trust property, did appear upon the hearing of the petition and made no objection thereto. No notice was given of the pendency of the petition asking for authority to issue the fourth equipment loan bonds, but it appears that the committee of the first and second mortgage bondholders appeared at the hearing, and assented to the making of a decree authorizing said loan. The committee of the first and second mortgage bondholders were notified and appeared, and either assented or offered no objection to the making of the several decrees under which the bonds were issued that were negotiated by the receivers and managers. If the action of said committee

in what was done by them was binding upon the bondholders whom they professed to represent, the receivers and managers had full authority, as far as said bondholders were concerned, to issue the bonds authorized by said decrees.

In examining the question as to the power and authority of said committee, it is necessary to consider the facts, as developed by the evidence, which induced the parties in interest to require that permanent provision should be made for their appointment. Down to the compromise decree of 1864 the bondholders were simply creditors of the corporation; they had no voice in its management, or right to influence or control its action. Their right to be represented and to participate in the management of the property which was pledged for the payment of their bonds, was recognized, and the provision in that decree for the appointment of such committee was to protect the interest of the first mortgage bondholders. They were constituted an advisory board in respect to the management of said roads and property, with the right to advise the trustees and receivers in respect thereto. They were also constituted auditors of the accounts of the trustees and receivers, and those accounts, when approved by them, were to be passed and allowed without further proceedings; but the right to object to any part of said accounts was reserved to the trustees of the second mortgage and the Vermont & Canada Railroad Company; and upon such objection being filed the accounts objected to were to be examined and passed upon according to the usual course. As long as the mortgage bondholders availed themselves of the provisions in the decrees of 1864 and 1866, and elected and continued in office the committee provided for by them, they were legally and equitably bound by all that said committee may have done in the execution of the duties imposed upon them by virtue of their office. The bondholders delegated to said committee authority to do what they might individually and collectively have done in the premises. The issuing of the bonds was a matter pertaining to the management of said roads and property, and about which said committee had the right to advise the trustees and receivers; the committee either assented to, or did not object to, the issuing of said bonds by the receivers and managers and in their capacity of receiv-

ers and managers. The history of the case shows that both classes of bondholders directly or indirectly received a portion of the avails of said bonds, thus adopting and ratifying to that extent the acts of the receivers and managers in issuing and negotiating them. It probably would not be claimed that if the bondholders had individually assented to the issuing and negotiating of said bonds upon the representations made in the petitions upon which the decrees were made giving authority to issue them, and which the court found to be true, that they could afterwards question the right of the receivers and managers to issue them in that capacity; and in view of the power and authority given to the committee by the decree of 1864, and what has since transpired in the matter of adopting and ratifying the action of the committee, we think that the bondholders are bound by their action in the premises as fully as if they had individually assented. The bonds were negotiated by the receivers and managers and it is alleged in the bill that the avails were used for the purposes designated in the decrees authorizing their issue. The interest was paid on them out of the income of the trust property down to 1876.

The receivers and managers were not discharged by the court until the appointment of the Central Vermont Railroad Company, and no persistent attempt has been made to have them discharged by the bondholders or any one else interested in the property. They were recognized as receivers and managers by all the parties interested in the property, by the Legislature of the State, and in all courts where questions have been adjudicated affecting the rights and liabilities of those interested in the property. Purchasers of the bonds relied upon the apparent authority of the receivers and managers to issue them, and upon the security that such obligations ordinarily give. Which has the superior equity? such purchasers or the mortgage bondholders? It is claimed that the persons claiming to be receivers and managers, were not strict receivers, and hence that the obligations which they gave cannot in a court of equity be treated as receivers' debts; but in our judgment it is immaterial whether they were strict receivers or not. The bondholders suffered them to appear to be receivers, and to issue negotiable bonds as such, and where one of two in-

nocent parties must suffer by the act of a third, he who gave the power or opportunity to do the act must bear the burden of the consequences.  If there was any defect of authority on the part of the receivers, the acquiescence of the bondholders in what has been done by them is as effectual as the most formal authorization in advance, or ratification afterwards, would have been.  So that, as between the *bona fide* holders of the bonds that have been issued and negotiated under the so-called orders and decrees and those that have been received in exchange for them, and the Vermont Central Railroad Company, and the mortgage bondholders, the former have the superior right and must be first paid.

We come next to the consideration of the claims of the stockholders of the Vermont & Canada Railroad Company.  The contracts entered into between the Vermont & Canada Company and the Vermont Central Company, in 1849 and 1850, have been substantially stated.  The history of the litigation that ensued between the parties to those contracts, and which resulted in the decree of 1861, is elaborately stated in the report of the case in 34 Vt. 1.  The validity of said contracts, and the right of the Vermont & Canada Company to the security given by the contract of 1850 for the rent agreed to be paid, was then established.  It is important, in determining what the present rights of the Vermont and Canada stockholders are, to state somewhat in detail the questions and how they arose, that were then adjudicated. Neither the Vermont Central Railroad, nor its income, was pledged for the Vermont & Canada's rent under the contract of 1849.  Under the contract of 1850 it was agreed that if the rent reserved to the Vermont & Canada Railroad Company should be in arrear and unpaid for the space of four months after due, it should be lawful for the Vermont & Canada Company to take possession of, and use and run both roads, and receive all tolls, fares and income receivable for the use of the said roads, and after paying all reasonable expenses of running and working said roads, and making such repairs of the same and the buildings and structures connected therewith, and the expense of all such engines and cars as might be necessary, to apply the residue of said receipts to the payment of rent then in arrear and unpaid,

whether it shall become payable before or during the time while so in possession. The Vermont & Canada Company reserved the right of resorting to an action at law to recover any rent in arrear if it should choose to do so. There was a further stipulation in that contract, which it is claimed by the Vermont & Canada Railroad Company, was, in legal effect, a mortgage by the Vermont Central Railroad Company to the Vermont & Canada Railroad Company of its road and franchise as security for said rent. The Vermont & Canada Railroad Company brought its bill in equity praying that it might be let into possession of both roads, or that the court would aid it in securing the income of the same pursuant to the contract of 1850 ; or that if it did not seem fit to the court to make an order putting it in possession, that the court would appoint some suitable person or persons, to be the receiver or receivers and the manager or managers, of said roads and property. It was under this prayer that the court, in 1861, ordered and decreed that the possession, control and management of said roads and property should be continued in the then receivers, subject to the order and direction of the court. It was upon the application of the Vermont & Canada Railroad Company, and to render the security given by the contract of 1850 available that the order was made, and the receivers were ordered to pay over to the Vermont & Canada Railroad Company, on the first days of June and December in each year, such sums as might accrue from the earnings of said roads and property, until the sums then due and growing due to them under the contracts of 1849 and 1850, should be fully paid and satisfied.

It is claimed that the rent reserved to the Vermont & Canada Railroad Company was secured under the decree of 1861 upon the *gross* income of the property, but we do not so understand it. The court did not by that decree change or vary the contract of 1850, but decided it to be a valid and binding contract, and made provision for carrying it into effect ; so that, in ascertaining what income was secured for the payment of said rent, resort must be had to the contract of 1850. It will be seen that by that contract certain expenses were first to be paid and the residue of the receipts was to be applied to the payment of rent. The fund that

was made applicable to the payment of rent was what might remain of the earnings or income after the payment of said expenses, and this would be the *net* income. There is no ambiguity in the contract; and to construe it as pledging the *gross* earnings or income would be giving it a construction not warranted by the plain import of its language or the evident intent of the parties who made it. In *The Vermont & Canada Railroad Company* v. *The Vermont Central Railroad Company, et al.*, 50 Vt., page 560, Judge BARRETT says, in remarking upon the decision made in 1861, that the Vermont & Canada Railroad Company was to have the net income from the use of both roads applied to the payment of its rent; and on page 587 he defines net earnings to mean what is left after paying the legitimate cost and expense of making earnings by the use of the property.

The receivers and managers, and their successors by appointment, continued in the possession, management and control of said roads and property without objection or protest of the Vermont & Canada Railroad Company or any of its stockholders, until the 21st day of June, 1873. The rent upon the original stock and the stock that was subsequently issued, was paid by the receivers and managers down to 1872; no motion was made for their discharge and no notice was given that their duties were terminated and ended. There is nothing in the record tending to show but that the Vermont & Canada Railroad Company and its stockholders regarded and treated them as occupying the same relation to the property during all that time that they occupied from 1861 to the time when the rent in arrear was fully paid. In the petition praying for authority to make the first equipment loan, the receivers set forth the gross and net income of the property for the years 1864-5, that they had made large expenditures in extending the Vermont & Canada line, and in purchasing increased fixtures and equipment; that to provide for and accommodate the business with justice to the public and to the best interest and profit of the line, large additional structures, fixtures and equipment were required, and that they had no funds with which to make them; that if the income of the property was to be devoted to that purpose, the payment of rent and interest provided for in

previous decrees would be necessarily suspended. The Vermont & Canada Railroad Company, upon the return-day of the petition, appeared, by its solicitor and a majority of its directors. The court found the matters stated and set forth in the petition to be true, and made the decree, thus enabling the receivers, by the avails of the bonds issued under the decree, to provide the necessary structures, fixtures and equipment with which to earn income by the use of the property that was applicable to the payment of the Vermont & Canada rent. What has been said in relation to there being rent in arrear to the Vermont & Canada Railroad Company at the time that decree was made, and the bonds issued under it, need not be repeated.

In the petition for leave to make the second equipment loan the receivers represented that they had expended the whole income of the property in making the improvements and purchases specified in the petition and were still under liabilities on account of such expenditure for the benefit of the trust, of about $753,000, and without funds with which to pay the accrued and accruing rent of the Vermont & Canada Railroad Company and the interest on the trust debt. Public notice was given of the pendency of the petition, and neither the Vermont & Canada Railroad Company, nor any party in interest, appear to have objected to the granting of the prayer thereof, and upon the finding by the court that the facts set forth in the petition were true, the decree was made. The petition for the third loan set forth the same reasons (substantially,) to justify it, as were set forth in the petition for the second, and upon the hearing the court found that the directors of the Vermont & Canada Railroad Company at a meeting called and held on the 9th of April, 1869, voted to assent to a further issue of equipment bonds not exceeding one million dollars over and above the present; and the decree made authorized the issue of one million dollars.

The petition for the fourth, or what is commonly called the guaranteed loan, alleged that there was outstanding against the receivers a floating debt of about $1,500,000, which had been created in improving the road-bed and superstructure of both roads, and providing such additional equipment as was necessary

for the useful and efficient operation of said roads, and for other purposes incident thereto ; that if said debt should be paid out of the net earnings of the roads it would embarrass the payment of dividends and interest; and that the Vermont & Canada Railroad Company, at a stockholders' meeting, had voted to endorse and guarantee their notes to the amount of one million of dollars, if the court should give them authority to issue them.    The vote passed at the stockholders' meeting therein referred to, has been hereinbefore recited.    All parties in interest being represented, and assenting to the granting of the prayer of the petition, the decree was made accordingly.    The fifth and last petition, asking leave to make a loan, represented that the first equipment loan of $700,000 would become due on the 1st day of November, 1875, and that provision should be made for its payment ; that there was a large debt outstanding against the receivers and managers, in the form of a temporary loan which had been contracted, in part, by the purchase of personal property, supplies and equipment upon the lines recently leased by them, and that further equipment was required for the use of said roads.    Notice was given to the Vermont & Canada Railroad Company of the pendency of that petition, and the president of the company appeared upon the hearing.    No one objected to the prayer of the petition being granted, and a decree was made authorizing the issue of not exceeding $2,500,000 of bonds for the purpose of retiring the first equipment loan and for the other purposes named in said petition.

This constitutes the history of the manner and circumstances, as far as the same need be given, under which the persons assuming to act as receivers and managers issued the bonds authorized by said decrees.    The bonds were negotiable in form, and have been sold and transferred like other negotiable paper.    There is no evidence tending to show that any party who has held, or now holds them, had notice of a want of authority to issue them for just what they purported to be—obligations of receivers and managers. All that has been said in relation to the claims made by the mortgage bondholders applies with equal force to the rent claim of the Vermont & Canada Railroad Company.    That corporation and

its stockholders, with knowledge that the receivers and managers were acting as such, and appearing to the world as their receivers, and issuing negotiable obligations as such, have remained passive and suffered the deceit, (if there was deceit,) to continue without giving a note of warning to parties who are liable to be deceived by such appearances, or putting on record a single fact that might have led to the discovery that the obligations thus issued were being issued without lawful authority.

The rights and liabilities of the parties are not dependent upon the rules of law as understood and administered in a strict receivership. The Vermont & Canada Railroad Company has so conducted that it is estopped from denying that the acts of the receivers, while acting as such, are as binding upon it as the acts of strict receivers would have been; hence the payment of the rent claim of the Vermont & Canada Railroad Company must be postponed to the payment of the bonds issued by the receivers. As between the *bona fide* holders of the bonds so issued, and those that have been received in exchange for them, and the Vermont Central Railroad Company, the mortgage bondholders, and the Vermont & Canada Railroad Company, the former have the superior right and must be first paid; and the holders of such bonds are entitled, after the special security which was pledged for their payment has been applied, to have the property of the Vermont Central Railroad and the Vermont & Canada Railroad, or the earnings or income thereof, appropriated to pay what may then remain due on the same.

The floating debt, the orators claim, has been contracted for money borrowed for the current business of carrying on and operating said roads and the purchase of material and supplies; that without the advance of said money the roads could not have been operated, and that it is unsecured by any special pledge of property. The orator, the Central Vermont Railroad Company, avers that at the time of its taking possession of the roads and property, there was a large floating debt outstanding, incurred by the former managers in the operation and management of the property, which it was obliged to pay; that without the payment of said money by it the roads could not have been run and operated,

18

and that it now constitutes a proper debt due to it from the trust or the trust property. The defendants claim that the money so paid was paid without legal authority and unauthorized by them, and that the Central Vermont Railroad Company and others making such payments and advances have no lien upon the property or income to secure its repayment. The same claim is made in relation to the rest of the floating debt and the additional claim that that debt was incurred in part in the execution of contracts made by the receivers and managers, which were outside of and wholly disconnected from the management of the property which constituted the subject-matter of the receivership under the decree of 1861. The history, character and quality of that debt has not been so ascertained as to justify making any order concerning it, and we purposely avoid any intimation as to the equitable rights of the holders of that debt. Upon the coming in of the report which will be made to the Court of Chancery, those claims will stand for consideration and determination, and such rights can be accorded to the claimants as the facts so to be found will legally warrant.

The rights and liabilities of the Central Vermont Railroad Company are so far dependent upon the facts that may be found in relation to the floating debt, which it claims it has paid or assumed, and for which it asks reimbursement and indemnity, that any decision attempting to define and settle those rights and liabilities would now be premature. Its equitable rights cannot be fixed and determined until the facts connected with its possession of the property and the floating debt are so presented that the court can form a judgment based upon them and the law applicable to them. Neither is there any present necessity for making any remark as to the character in which the Central Vermont Railroad Company took, and has since retained the possession of the property, or for giving any direction to the Court of Chancery for its guidance in the ascertainment of the amount which has been received by that company, and how it shall be appropriated.

In passing upon the questions in issue in this cause, we have proceeded upon the theory that as between the Vermont Central Railroad Company, the mortgage bondholders and the Vermont &

Canada Railroad Company, and the parties that are making claims against the property in opposition to them, the Vermont Central Railroad Company, the mortgage bondholders and the Vermont & Canada Railroad Company are estopped from denying that the parties professing to act as receivers and managers had power and authority to bind them and the property to the same extent, and. for the same purposes, that strict receivers might. Enough appears to clearly justify the application of that rule to the Vermont Central Railroad Company and the mortgage bondholders. From 1864 to the time of the last issue of bonds by the receivers and managers, the bondholders by their advisory committee assented to the issuing of the obligations that were issued, knowing that they were being issued by the receivers and managers, as such, and being negotiated and sold to innocent purchasers, and that the avails, in part, were being used for the payment of the interest upon their bonds, and in making valuable and permanent improvements upon the property on which their security rested.

There is a seeming hardship in applying the rule to the Vermont & Canada Railroad Company. That company in the first instance, had no further interest in the improvement or conservation of the property, than that it should be in a position to earn net income with which to pay its rent. It might well have remained passive as long as that rent was paid, and it was the right of the Vermont & Canada Railroad Company to apply to the court to enforce the remedy provided for in the contract of 1850, when the rent should be in arrear. When the receivers, who were appointed upon its application, had executed their duty by paying the rent in arrear, it was the right and duty of the Vermont & Canada Railroad Company to see to it that they were discharged, if it would avoid the consequences that might result from their longer continuing to exercise the duties of receivers and to appear ostensibly as *its* receivers. From what was done by the Vermont & Canada Railroad Company in participating in the issue of the bonds by the receivers and managers, the parties who purchased them no doubt understood, and had the right to understand, that they were purchasing paper that the receivers and managers had the lawful authority to issue, as such, and that the

Vermont & Canada Railroad Company recognized them as its receivers. The Vermont & Canada Railroad Company now claims that it should be remitted to its rights as defined by the contracts of 1849 and 1850, unaffected by anything that has since transpired.

In determining the equitable rights of the parties, it seems to us that the rights of the holders of the bonds issued by the receivers and managers are superior in equity to the rent claim of the Vermont & Canada Railroad Company, and that they are entitled to the realization of the security which they supposed they were obtaining, as far as it can be accorded to them, in preference to the rent claim of the Vermont & Canada Company. It was held in 50 Vt. *supra*, that the holders of said bonds were entitled to the benefit of the securities pledged for their payment, but whether they were limited to such securities, as the only resource for compelling payment, was left undecided. It will be observed that the bonds contain an absolute and unconditional promise to pay, and that the pledge was collateral to that promise. Whether the taking of a special security is, in law, a waiver of all other securities or not, is generally to be determined by finding what the understanding of the parties to the transaction was at the time of the making of the promise and giving of the security. The proof clearly shows that it was not understood at the time the bonds were issued, that the security which was pledged was the only security which the holders had the right to rely upon to enforce their payment. The most that can be claimed by the other parties interested in the property, is that the property specifically pledged shall be first appropriated. The different classes of bonds, after the application of securities pledged for the payment of each, stand upon the same common right and upon perfect equality in the matter of exacting payment.

We have not been much aided by precedents in the determination of the questions involved in this controversy. We have not discovered any case so analogous to this in its facts as to be authoritative, but in its decision we have endeavored to follow and be guided by those familiar principles of equity law that are universally applied in the determination and enforcement of equitable

rights. We do not intend by what is now held to overrule the decision made by this court in *Vermont & Canada Railroad Company* v. *Vermont Central Railroad Company, et al.,* 50 Vt. 500. The opinion in that case defines the equitable rights of the parties substantially as they are now determined. We have built upon the foundation there laid. It is expected that what is now decided may result in the apportionment and distribution of the property in litigation, or the avails thereof, among those entitled to it, and by placing it under their own control to get rid of the disastrous litigation that has lain like a nightmare on the property for so many years.

And in view of the criticisms that have been made upon the actions of the different chancellors who have made or approved the orders and decrees which, it is claimed, have resulted in such disaster to the property, it is but an act of justice to say that there is not one of them that authorized the incurring of any pecuniary liability, or the making of any contracts that have resulted in a loss, to which the parties in interest had not given their assent, or failed to make any objection to, after having notice and opportunity to do so. In making such orders and decrees there was no occasion for the exercise of judgment. It was the method devised and agreed upon by the parties to give what it was then understood would be a judicial sanction to acts and agreements of the parties ; and the court has never been called upon to interfere by direction or advice in the management or control of the property.

The *pro forma* decree of the Court of Chancery dismissing the bill is reversed, and cause remanded with a mandate that it be referred to a master or masters, to ascertain and report the amount due of principal and interest on all the bonds issued and negotiated by the receivers, as such, or as receivers and managers, or as trustees and receivers, or as trustees and managers, and the consideration upon which they are held ; the kind and value of the property pledged to secure the payment of each of the different classes of said bonds at the time it was so pledged, and its present value ; the kind and value of the property purchased with the avails of the car-service pledged to secure the payment of said bonds when purchased, and its present value ; the amount re-

ceived from the car-service pledged to secure them, and how the
money received on account of said car-service has been used and
appropriated; the amount due on account of the floating debt;
how, when and under what circumstances it has been contracted;
what proportion of said debt has been contracted for, or has
grown out of the necessary expense of running and operating and
maintaining said roads and property, and when. And that upon
the ascertainment of such facts, a decree be entered that will se-
cure the realization of the rights of the bondholders, as herein-
before defined, and the rights of any other of the parties as they
may be determined.

The following opinion was received by the Reporter on the 26th
day of March, 1881, and by the request of Judge BARRETT, it is
published here:

Opinion by BARRETT, J. Deeming it due to all interests con-
cerned, as well as to myself, that I should make known my views
in this case, and having ceased to hold the office of judge before
the opinion by Judge Royce was filed, and not having seen it till
the middle of the first week in January, 1881, I have thought of
no more proper way to do it than to put on file a redraft of a
paper I furnished Judge ROYCE before my term of office had ex-
pired, with some verbal changes not affecting the sense, and with
some omissions which his printed opinion renders proper, followed
by some quotations from the opinion of the court in the case of
*Vermont & Canada R. R. Co.* v. *Vermont Central R. R. et al.,* 50
Vt. Rep. 500.

The present case in material subject-matter, constituting the
ground of rights, duties and liabilities to be ascertained, declared,
and enforced, is substantially the same in the case decided by this
court in October, 1877, 50 Vt., 500. It was in that case decided
that after the *compromise decree* there had been no recceivership
created and administered by the court, but only a contract manage-
ment, under the control of the parties in interest. It should not
now be held otherwise, nor should this case be disposed of on any
different ground. It should be considered and disposed of as one
in which the holding and management, after the compromise de-

cree went on by the agreement of the parties, down to the accession of the Central Vermont Railroad Co., and not by the control and order of the court.

This was expressly held and demonstrated in the decision of 1877.

The Central Vermont Company came in upon its own asking and the asking of the persons who had held the management down to that time, and who were largely the stockholders and officers of that company. It came in, not under the compromise decree, nor with the consent of the parties to that decree, but against the will, and wish, and the objection of said parties. Those persons theretofore holding the management did not represent the parties and interests for whose behoof they held their position under the compromise decree, in asking to be supplanted by the Central Vermont Company.

To do so was outside their official prerogative, and in violation of their fiduciary right and duty. (See *Stevens v. Willard and others*, 43 Vt., 692.) The Central Vermont Company, therefore, stands in no relation or privity with the primary parties (viz., the Vermont & Canada Company and the Vermont Central Company and its mortgage bondholders), that entitles said Central Vermont Company to indemnity or reimbursement as against those parties for the expenses in any way incurred in holding, managing and operating said property. It took the possession and management, subject to the right of the Vermont & Canada Company to its rent, and of the said mortgage bondholders to their interest and principal.

No creditor of the Central Vermont Company has claim, legal or equitable, to be answered by or in preference to the Vermont & Canada Company, or said bondholders, or to be enforced against or in preference to said parties. Said Central Vermont Company is not entitled to set up any claim against said property or the earnings, in prejudice to the rights of said parties to their rents, and to the interest and principal on their bonds. That company is answerable for the utmost care and discreetness in managing the property as a source and means of realizing income, wherewith to pay said rent and said interest and principal. It cannot charge

against said rights of either of said parties any outlays for improving the road or its equipment beyond necessity of preserving the property and doing the business.   The property is in the hands of said company charged with the first duty to realize income, and pay said rent, and bonds, and interest, and with no right to make outlays beyond what is just named, and charge the same on said income, or on the corpus of the property.   Whatever is done by way of adding value to the property, beyond keeping it in working order, to the end of realizing income with which to pay said rent and bonds, must be at the expense of the Central Vermont Company, and not of the parties who are entitled to the earnings of the property, when kept and cared for, and used as those parties themselves would have done, if in possession and managing, with a view of realizing the utmost earnings and income consistent with keeping the property from waste or deterioration for current practical use.

The claim and right of the Vermont & Canada Company is for rent, and not for the possession, as owner, of either of the roads. The claim and right of the bond-holding mortgagees is for payment of the interest and principal of their bonds, or the possession of the two roads (*having title to the Vermont & Canada Railroad* under their mortgages, and the right of use of the Vermont & Canada Railroad under the lease.)   The Central Vermont Company holds subject to those rights, and only by answering to them should it be permitted to hold.

There is no floating debt accrued since the Central Vermont took possession, to which the Vermont & Canada or the mortgage bondholders should be subjected or postponed.  They cannot properly be subjected to or affected by any floating debt, unless for what accrued while they were parties to the management under the compromise decree, and prior to the time the Central Vermont Company took possession.   They are not answerable to said company unless it holds, as assignee, unpaid debts of the prior management, that the original creditors would be entitled to enforce in preference to said rent and bonds, and that said company may be equitably entitled to enforce, in view of all that affects its relations to the subject and to said other parties.

Recurring to what is said on page 46 of the pamphlet print of the decision of 1877 (I here insert it, thus):

"The participation of some of the parties in interest in the current administration, in one way and another, through advisory boards, and standing and temporary committees, and by stockholders' and bondholders' votes, and by the action of directors, may have an important bearing in determining ultimate rights and liabilities, if they should hereafter be brought in question before the courts ; as also may the fact that the managing parties may have been largely interested in the subject-matter and the results of the management."

I therefore proceed to say, that no definitive decision and mandate should now be made, in advance and anticipation of facts actually found and established; or upon any hypothesis or theoretical supposition as to what may be hereafter found or established as matter of fact, and as constituting the ground of claim and right on the part of any party, or as affecting the quality and merits of such claim and right; nor should such decision and mandate be made till there shall have been ascertained the respective claims of the different classes of claimants, the relations sustained by such claimants to the Vermont & Canada Company as stockholders, directors, or other officers in said company; also their relation to the Vermont Central Company as stockholders, directors, or other officers in said company, or as bondholders, or as trustees under either or both of said mortgages ; also their relation to the management since the compromise decree, as being of the board of management, by whatever name called ; or of committees in behalf of any interest connected with said management, or with the subject-matter of it, nor till there shall have been ascertained the character and amount of the respective claims,—in what way and for what purpose they accrued, and in what right they are now held by the claimants, and upon what consideration ; and if they accrued as what is now called floating debt, what was the subject-matter and occasion ; and by and with whom were they negotiated and created, and by what contract; also all facts relating thereto that would affect the legal or equitable right in respect thereto, and the amount and payment thereof, as against or in preference to any other parties.

This is an extraordinary case, both in the history of its origin

and progress, and in the vastness and complication of the interests involved.

The Vermont Central Railroad Company and its mortgagees owned its road, and they have not parted with their title. It had a perpetual lease of the Vermont & Canada Railroad, giving the right to possession and use, subject to the payment of the stipulated rent. Rent getting in arrear, the property went into the hands of the receivers of the court whereof to make income by use, and pay the rent. Afterward, by arrangement, it went into the hands of fiduciary managers in the interest only of the primary parties, for the purpose, by use, to realize income with which to pay said rent, and also the interest and principal of the mortgage bonds. Professedly for that purpose, the possession and management was held down to the accession of the Central Vermont Company, in 1873. Professedly for that purpose, said company took the possession, in succession to the managers, under the compromise decree upon the joint petition of said company and said managers, and against the will and objection of the legitimate and primary parties.

That possession and management for said professed purposes went on, and is still going on ; and yet, since June, 1872, no rent has been paid, nor interest or principal on said bonds. Since 1876 nothing has been paid on the securities issued by the prior management. The party in possession has gone on the same as if absolute owner of the property, building and enlarging depots, laying steel rails, running and equipping, and helping in the construction of other roads, receiving and disbursing the receipts and proceeds, as if absolute owner of the property, without duty, accountability, or liability to anybody else. And now said party in possession, viz., the Central Vermont Railroad Company, with the persons constituting said company, and divers persons having a community of interest in the result asked, is in Court, asking, as the result of the stewardship which has been exercised over the property, that a decree may be made that will necessarily divest the original parties of their title to the property, and of their rights in the use and income of it, without the payment of accrued arrears of rent, or of interest, or the principal of said bonds, and

Langdon v. Railroad Co.

without resource for the payment of anything on the score of rent or mortgage bonds in the future.

Such a history and such an asking are without a parallel. Such a result, outside of the court that shall decree it, cannot without difficulty be comprehended and appreciated as a legitimate result, obtained by a correct application and just administration of the law governing, defining, and enforcing the rights, duties, and liabilities of the respective parties and interests involved.

In arriving at such a result, the utmost of anxious and scrutinizing examination, discussion and consideration should be exercised by every member of the court, and the utmost assurance should be felt that such a result is warranted and required by the law in its proper application and force.

In no event, in the case as now made, can there be anything more than a lien and charge upon the *income* in preference to the primary parties, accorded to any class, or individuals, of the claimants or creditors; and not upon the *corpus* of the property; and such preference should be accorded only to such as show themselves equitably entitled to it, having regard to everything, by way of relation or act, that would affect the equity of the claim of any one, as against any other party in interest.

The decision and opinion of October, 1877, embody the views of myself, and of every member of the court that made the decision. What has been said and suggested above is merely supplementary to, and not designed to repeat or substitute what is expressed in that opinion. What is there expressed, with what has been here suggested, constitutes the light, the views, and the reasons, in and upon which the present case should be disposed of.

I add, that no single claim, or class of claims, can be eliminated, and be considered, and disposed of by itself. The relations and complications are such that all rights, duties, and liabilities must be ascertained before any definitive disposition can be made of any.

I close by repeating, the Vermont & Canada Company has not given up its rights as owner and lessor. The mortgage bondholders have not given up their rights under their mortgages.

The title to the property is in the Vermont Central Railroad Company, subject to the rights of the Vermont & Canada Com-

pany and said mortgage bondholders.   The original trustees and managers under the compromise decree had only the possession *in trust.*   The Central Vermont Company has possession only *in trust.*   Its position is *trusteeship* for the behoof of the Vermont & Canada Company and of said mortgage bondholders, whether it obtained and holds the possession rightfully, or without lawful right.

The foregoing is, in substance, what I said, or meant to say, in our last consultation, without regard to the order.

I desire that the other judges should see this manuscript prior to considering and passing judgment upon the draft of opinion which I suppose you will make and submit to them before announcing the decision and promulgating the written opinion.

In view of what was said by myself and the other judges, when in our last consultation I called attention to what was said in an article signed " A Boston Lawyer," printed in the " Boston Daily Globe " of December 26, 1877, and afterwards reprinted in other papers, copies of which were sent to me ; viz.:   " That the entire Supreme Bench, with the exception of its author, very much regret its." (the opinion delivered by me in October, 1877) " delivery in such form, and would be very glad to recall and revise it, if that were possible."   I urge and expect that, in the opinion to be drawn up by you, it should be distinctly stated that the judges constituting the court that made the decision in October, 1877, still hold the views embraced in that opinion.

I have been many times credibly told that the sentiment of the above, from the article in the " Globe," has been often and sharply expressed by representative men who were not satisfied with that decision.

The foregoing, with said verbal changes and said omissions, is what was furnished to Judge Royce, as above stated.   In view of some expressions in the opinion by Judge Royce, about having " the *property* of the Vermont Central Railroad Company and of the Vermont & Canada Railroad, or the earnings or income thereof, appropriated, etc.," and about " the apportionment and distribution of the *property* in litigation or the avails thereof," etc., and of a kind of complexion which it bears when compared with the

opinion of 1877, I deem it proper to quote some passages from the opinion of 1877, as follows:

"It has already been said, that in the case as it is now before the court, and for the purposes of the case, the various parties in interest may not question the validity of the proceedings, as shown by the record, so far as those parties are affected by consent and acquiescence in said proceedings and the carrying of them into effect. It is now to be remarked, that however they may be affected thereby, it must be in virtue of the substance and reality of what has been transacted by parties and court, and not in virtue of formality and semblance. In entering into the agreement for the compromise decree, and assenting to it and acting under it, the parties are entitled to regard it, and to have it regarded, as being just what it was understood and designed to be, viz.: a permanent arrangement by agreement for the administration and handling of the property with such control by the interested parties as was provided for, and with such a relation to the original cause and the functions of the court as was understood to be provided for in that compromise agreement and decree. And the same is true as to all that ensued by way of orders and decrees. As did the compromise decree, so the subsequent orders and decrees, as to the various matters embraced, derived their force from consent. The present proceeding supervenes upon all that has been ordered and done, for the purpose of a final consummation and ending of the entire matter, and of dismissing it and the parties and interests from any cognizance of the Court of Chancery. Of course, this requires the court to have regard to substance and reality of what has been done, whereby the matter is brought down to the present conjuncture.

"As is said in *Wadhams* v. *Gay*, before cited: 'Equity will penetrate beyond the covering of form, and look at the substance of a transaction, and treat it as it really and in essence is, however it may seem;' and the judge proceeds by way of application: 'In outward semblance, this partition decree is a decision of the court upon the relative rights of Charles D. Flaglor and his children under the will of Garrett. In essential character it is but the judicially recorded supposed agreement of Flaglor.'

"The court could not, in the first instance, bind by judgment, decree, and order beyond the scope of the original bill, except by consent, and by acquiescence in the execution thereof, and it would be without warrant for the court to supervene upon what has come to pass in virtue of agreement, consent, and acquiescence, and deal with the subject and the parties the same as if all had been done within the scope of the original bill and under the original decree, in the legitimate exercise of judicial prerogative, in the discharge of judicial duty, and as the result of independent judicial judgment.

" So far as consent was given to, and there has been acquiescence in, the compromise decree, and in its execution, it was on the supposition that it would have operation and effect according to the intent indicated by its terms and provisions. But for that, the agreement would not have been made or the consent given. It was in that view that it became the law for the administration of the property, as distinguished from the law that ruled the original decree, and would have continued to rule, so long as that decree was the rule and authority for the administration of the property. In that view the Court of Chancery performed its part in and under the compromise and subsequent decrees. All the contracts of lease have been entered into and have gone on in operation in that view. All the credits have been obtained upon managers' bonds and their securities, and on stocks newly issued, and changes and substitutions of credits and securities have been made in that view. Now, when it is claimed or held that parties are concluded and bound by participation, acquiescence or consent, it cannot be held that they are thus bound by and to something other and different from the real substance and fact of the successive proceedings, measures, and transactions, as they currently went on, and were understood and intended by all concerned.

" If the Vermont & Canada Railroad Co. had forecast that it would be the possible result of the compromise decree that the Court of Chancery would have, or exercise, the power of ordering a sale of all the property to a third party to pay the expenses of administration under that decree, leaving rent unpaid and unprovided for, would it have been party to the compromise consummated by that decree ? The same may be asked as to the mortgage bondholders of the Vermont Central Railroad Co. individually and representatively. If such a result had been forecast, would parties have taken the various classes of equipment and guaranteed bonds, and other credits to the trust, purporting to be backed by specific security on the property, and on car service, and by the guaranty of Vermont & Canada Railroad Co.? For what is the ground of the credit, and what the resource of the Vermont & Canada Railroad Co., but the stipulated rent, with the security for it, and the right to have it paid or realized as provided in the solemn contract of lease and the provisions of the compromise decree,—namely, to be earned by the two roads under the administration provided therein, and by what ensued thereon by way of agreement and supervening orders of the court ? Would the parties to that decree have agreed to its being made, and participated in its execution, if it had been forecast, as a possible result, that the effective force of the lease and mortgages as contracts was to be annulled, and the rights created thereby to be abrogated and rendered impossible of realization, and the decree itself to be declared a nullity except to the end and effect of warranting the Court of Chancery to deprive the parties to

it of the ground and subject-matter of their rights, which it professed to confirm, and was designed to serve and realize ? Would the holders of the trust loans have become such, if it had been forecast as possible, that not only the promise to pay, but the pledges of specific security, were, by judicial act and sanction, to be 'broken to the hope,' and, further, not only not even 'kept to the ear,' but disclaimed and annulled ? If other contracting parties had forecast such a result, would they have entered into the various contracts of lease, and traffic, and control ?

" All present interests have come into present posture in full view of the system devised and instituted, and carried forward by the compromise decree, supplemented by what has been devised and done since. The Vermont & Canada Railroad Co. voluntarily assumed its part and position in reference to, and under the decree of 1864, and participated in and helped forward the whole course of transactions and events down to the time it failed to get its 8 per cent. on $3,000,000 in June, 1872. The first and second mortgagees of the Vermont Central Railroad Co. did the same, down to the time they failed to get payments under the administration which they had helped to establish and operate. All bond creditors, and all floating-debt creditors, since the compromise decree, have become such, knowing, or bound to know, the legal and actual *status* and character of the subject and of the parties with which and whom they were dealing. The Central Vermont Railroad Co. solicited the official position of receiver and manager, upon a joint petition of itself and the then board of management, in succession to that board, and the position was accorded, with all the responsibilities then existing, and thereafter to accrue, which rested upon that board, and would thereafter have rested upon it, if it had continued in the management.

" To all, the records of the Court of Chancery, and the files in the clerk's office, and reports in the office of managers, promulgated to all by pamphlets and newspapers, were accessible and intelligible; and they disclosed the *status* and the course of management under the decree of 1864, and what was the real character, in law and in fact, of that management. The managers and others having deep interest and active participation in the measures devised, and in the course pursued, were full of knowledge of all that was in progress, both official and not official ; full of knowledge of what was the substance and reality of the matters in hand, and what was formal and factitious. Ignorance of the facts cannot be asserted by any party as constituting an element or ground of right or claim to preference or priority as against or over any other party. All and each must stand as claimants or creditors with such rights as exist in them respectively resulting from the reality of the transactions by which they are affected. As their position as claimants or creditors has become fixed in view of the compromise decree, and the ensuing administration, designed, devised, carried on, and regarded as already set

forth, they are entitled to have that view realized to themselves respect-ively to the utmost extent practicable. It would be without reason and without warrant to bind them to the legal character of the receivership of 1861, as governing the prerogative and duty of the court in reference to the property and interests now involved, when, in point of fact and of law, the essential character and purposes of the receivership were changed by the decree of 1864, and the whole course of control and management has been, not for the purpose to be served by the original receivership, but for purposes not in the mind of the court, or of the parties, or of the public, when that receivership was created, nor down to the compromise decree of 1864.

" It is plain that the Vermont & Canada Railroad Co. and mortgage bondholders of the Vermont Central Railroad Co. hold a position relative to the subject different from that of the creditors of the trust. The ground of right and claim of the former was the lease of the one, and the bonds and mortgages of the other. It was to render available the right of each respectively that the compromise decree was made and went on in execu-tion. The management and administration were subjugated to the legal incidents and consequences thereof ; and we do not understand it to be controverted, that the expenses properly incurred are to be paid, before the beneficiaries of the trust are entitled to partake of the earnings. The contest has been against making such expenses a charge upon the *corpus* of the property, in priority to other rights and interests, in such a sense and manner as to render the sale asked for lawful and needful.

" The creditors of the trust, as they are called, have become such by transactions having reference to the carrying on of the business and ad-ministration of the management under the compromise decree. Primarily, that business and management were not carried on for their interest and benefit, and not at all for their benefit except as they were interested in such success as would make sure the payment of their claims. It is true that the managers were to hold and use the pledged equipments, and out of car service were to earn money to pay on those claims ; but that was not in such a way or sense as to make the pledgees chargeable with the expense of such *use and service*. That use and service were in the admin-istration that was going on for the behoof of the primary parties, and at the charge of such administration.

" It may now be said, summarily, as the result in this respect, that the Vermont & Canada Railroad Co. stand upon their lease, under the com-promise decree, and the decrees and orders following, with the right to have the stipulated rent paid out of the net earnings. Subject to this, the mortgage bondholders of the Vermont Central Railroad Co. stand upon their mortgages, under the compromise decree, and the decrees and orders following, with the right to have the net earnings appropriated. according to the respective provisions in that behalf. ' *Net earnings* '

means what is left after paying the legitimate cost and expense of making earnings by the use of the property.

" The holders of the trust bonds stand upon the rights created and vested by the respective transactions constituting the issue, appropriation and receipt thereof, respectively, including a right to the security provided, according to the legal effect of the provision making such security. The bonds were taken for the required consideration in faith of the promise to pay interest and principal as stipulated, and in reliance on the security provided and pledged. This vested in the bondholder the right resulting from the transaction by the legal effect of the promise, and to the security pledged. This is in no manner affected by the fact that the promise may not be performed, and the security may prove inadequate and worthless. Of course the bond-buyers knew what they were buying, viz., a bond issued and secured in the carrying on of the management of the property by the persons in charge, as such management was shown by the records, and files, and official documents to have been created and carried on, and which might continue to go on indefinitely in the uncertain future. In view of this, each bondholder took the hazard of both the present and prospective value of his bonds, as depending on the ability of the promissor, and the value of the security. If it should turn out that the pledged property had been used up or become worthless, and the *car service* fruitless, and the guaranty of the Vermont & Canada Railroad Co. a barren resource, that would not touch the validity and operative force of the contract and the pledge.

In this connection, supplementing a remark already made, it occurs to be said, that if it were to be held that all the property in the managers' hands would, as against the original parties, be chargeable with the debts of the management, the property thus specifically pledged would, as against the pledgees, be chargeable subject to such pledge.

" It is not deemed needful for present purposes to decide or debate whether the holders of the secured bonds are, on the one hand, limited to the security as their resource for getting payment of their bonds, or, on the other, they are to be regarded as having all the rights of unsecured creditors, with the security superadded. Nor is it needful to decide or debate the operation and effect, in the order of April 20, 1872, for the loan of $2,500,000, ' that the notes issued under this decree shall constitute a lien and charge upon the trust property, under the control of said trustees and managers, and the earnings thereof.'

" As to what is called the ' floating debt,' which rests upon the credit given to the trust management, the reason is not obvious why that debt should have precedence to any other of the trust debts,—*trust debts*, as distinguished from the claims of the Vermont & Canada Railroad Co. and the Vermont Central bondholders. The secured trust debts were contracted in the carrying on of the business of the management, for the

purposes contemplated and sought to be accomplished by the managers,—
just as the floating debt has been contracted, and for the same purposes.
It can make no difference whether that debt is due to outside parties, or
to the party managing. It is equally on the credit of the trust. The fact
that it is without specific security does not give it a higher rank, or a dif-
ferent right, from debts with security. It stands upon the credit which
induced the contracting of it, viz., the promise of the managing party in
view of ability and means for payment, just as the secured debts stand on
the same credit, and the security provided. What is now claimed is, that
that debt shall have precedence of the other trust debts, making it first
in right as to means of payment, even to the appropriation of the security
pledged for the payment of the other debts. There would be no warrant
for this, even in case of a proper receivership. The trust is the debtor
to each and all its creditors. In the settlement of insolvent estates of
deceased debtors the statute gives priority to doctor's bills, and other ex-
penses of the last sickness and funeral charges. But we know of no
statute, or rule of law, that would warrant the priority claimed in this
case.

"For the purpose for which the case is now before the court, we do
not design, nor would it be proper, to go beyond the needs for disposing
of it with reference to that purpose, in determining the *status*, rights,
and liabilities of the respective parties and interests. When specific
rights are claimed, and specific liabilities sought to be enforced, then will
be the proper time and occasion for considering and determining what
may be specifically before the court in that behalf.

"As already said and sufficiently shown, the position and office of the
Central Vermont Railroad Co. is to be regarded, not as that of a re-
ceiver, in the sense of the law, but of managing agent for the parties in
interest, having the character and office of an administrative trust. Its
primary relations are to and with the *cestuis que trust*, and its claim for
outlay, and service, and expenses incurred, is to be considered, estab-
lished, and satisfied with reference to that relation.

"In view of that relation, is there any warrant of law for ordering a
sale of the property? No case and no book has been presented or come
to our notice in which it has been propounded or held, that, in a real
receivership for managing property, to realize profits by use, and not
with a view to its ultimate sale, and the realization of money assets
thereby, the property has been, or should be, sold to realize means for
paying charges incurred in the management. The cases are numerous
of sales by receivers under the order of the Court of Chancery. But no
case is found in which such sale has been ordered, as a means of reim-
bursing receivership expenses, in virtue of a lien in that behalf."